**Samuel R. PRESIDENT, Appellant,**

v.

**Cyrus R. VANCE, Secretary, United States Department of State, et al.**

**No. 78–1226.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 3, 1979.

Decided April 25, 1980.

Roma J. Stewart, Washington, D.C., for appellant.

John H. E. Bayly, Jr., Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., Washington, D.C., at the time the briefs were filed, John A. Terry, Peter E. George and Dennis A. Dutterer,

Asst. U. S. Attys., Washington, D.C., were on brief, for appellees.

· Before BAZELON, Senior Circuit Judge, and LEVENTHAL * and ROBINSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal is but the latest skirmish in Samuel R. President's five-year quest for complete relief from the effects of admitted racial employment discrimination at the Department of State. The question is the precision with which a federal employee must formulate his grievance in order to exhaust administrative remedies prior to suit under Title VII of the Civil Rights Act of 1964.[1] The District Court granted the motion of the Secretary of State for summary judgment, holding that President had not exhausted sufficiently with regard to the particular relief he now seeks.[2] We affirm in part, reverse in part, and remand for further proceedings.

---

* Circuit Judge Leventhal participated in the consideration of this case but died before the decision and judgment were announced.

1. 42 U.S.C. §§ 2000e to 2000e–17 (1976). Suits by federal employees are governed by § 717(c) of the Act, 42 U.S.C. § 2000e–16(c) (1976), quoted in relevant part *infra* note 50. Presentation of the grievance administratively is a precondition to suit, see *id.*, but nowhere does the Act define the specificity with which that must be done. The Equal Employment Opportunity Commission (EEOC) has issued regulations governing the substance of complaints by *private-sector* employees, see 29 C.F.R. §§ 1601.12, 1601.15(b) (1979), and the courts have usually interpreted these regulations liberally in favor of lay complainants, see note 65 *infra*. We have not been referred to, nor have we found, any similar administrative prescription for the federal workforce generally.

2. *President v. Vance*, Civ. No. 76–2075 (D.D.C. Dec. 9, 1977) (final· order), Joint Appendix (J.App.) 114–115. The District Court also denied President's motion for partial summary judgment but, in a ruling not challenged on this appeal, granted his motion for counsel fees.

## I. BACKGROUND

Our decision hinges importantly on a proper interpretation of the facts. We pause, then, at the outset to review them in some detail against the administrative and judicial backdrop of the case.

### A. *The Employment History*

President entered the State Department's foreign service reserve at level FSR–6 in 1960, and was hired as a foreign service staff officer, FSS–4, in 1963.[3] In 1968 he left the foreign service and was appointed to a GS–11 position as a contract specialist in the Department.[4] He became a career officer in 1971 and in 1974 the first black officer ever assigned to the Office of International Arts Affairs (CU/ARTS) of the Department's Bureau of Educational and Cultural Affairs (CU).[5] It was there that his troubles began.

Whatever the causes, President's relationships with his co-workers were stormy from the start. He frequently felt that he was being asked to perform tasks below the level of his civil service grade;[6] co-workers, on the other hand, complained that he was exceeding his authority and trying to throw

---

3. See Official Personnel Folder Review of Samuel R. President, Administrative Record (Adm.R.) 96; Complaint ¶ 7, J.App. 9; Answer ¶ 7, J.App. 15. Unlike civil service grades, foreign service grades run in reverse order of numerical ascendency. Thus FSS–4 is higher than FSR–6, although GS–4 would be lower than GS–6.

4. See Official Personnel Folder Review of Samuel R. President, *supra* note 3. President's complaint in the District Court alleges that at that time he already held a competitive civil service rating of GS–12, see Complaint ¶ 9, J.App. 9, but there is no evidence for or against this claim in the record before us.

5. See Official Personnel Folder Review of Samuel R. President, *supra* note 3; Complaint ¶ 12, J.App. 9; Answer ¶ 12, J.App. 16. We use the rather cryptic State Department abbreviations "CU" and "CU/ARTS" for the sake of consistency with the administrative record.

6. See Complaint ¶ 17, J.App. 10; notes 13, 43 *infra*.

his weight around.[7] In no small part the problems stemmed from disagreement over the exact nature of his position and duties. When President joined CU/ARTS as a GS–12 contract specialist, a GS–14 administrative officer was in the process of retiring.[8] Guy E. Coriden, the director, decided to divide the retiring officer's duties between President and Bart N. Stephens, the deputy director and President's immediate superior, who had been with the Bureau just two weeks longer than had President.[9] Stephens was assigned "only those duties having to do with budget preparation" and others necessary for him to learn his new position;[10] President was to carry out "[t]he bulk of the fiscal, admin[istrative] and transportation work."[11] Having made this allocation, Coriden departed for seven months, leaving Stephens in charge of the office.[12]

During Coriden's absence disputes, seemingly petty, began to arise between President and some of his co-employees. These squabbles ranged from President's own claim that he was being assigned menial tasks[13] to contentions of other employees that he was interfering with their ability to do their jobs.[14] When Coriden returned, he discovered that the retired officer, some of whose functions supposedly had become President's, was still coming to the office two days a week.[15] This, according to Stephens, was necessary because President was unable to discharge adequately the responsibilities entrusted to him.[16]

President's difficulties in CU/ARTS climaxed when Stephens, in his capacity as supervisor, wrote a highly unfavorable evaluation report on President's performance.[17] Stephens rated him only average in eleven and below average in five of the seventeen categories addressed in the report.[18] In written comments accompanying the report, Stephens asserted that President was unable to perform many of the duties specified in his job description, and concluded, "I consider Mr. President, through no fault of his own, to have been misplaced and misassigned" in the Bureau.[19] Coriden, as director of the office, reviewed the evaluation and agreed with Stephens on many points.

---

7. See note 14 *infra*.

8. Deposition of Richard K. Fox, Jr., Deputy Director of Personnel for Career Assignments, Department of State, May 20, 1976, at 1–2, Adm.R. 440–441. Fox stated on recollection that "the job was way overgraded as a GS–14, and therefore [President's] transfer could be justified without a promotion." *Id.* at 2, Adm.R. 441.

9. Reviewing Officer's Statement, Sept. 2, 1975, at 1, Adm.R. 113.

10. *Id.*

11. *Id.*

12. *Id.*

13. See, *e. g.*, Equal Employment Opportunity (EEO) Counselor's Memorandum of First Meeting with Samuel R. President, Oct. 22, 1975, J.App. 30, Adm.R. 57 ("[h]e recalled a staff meeting . . . where Program Officers said they didn't need anyone to fill his position but what was needed was someone to mail and wrap packages, etc."); Attachment A to CSC Form 894, Oct. 22, 1975, J.App. 44, Adm.R. 47 ("Mr. Stephens . . . [f]ailed and refused to assign work to me as specified in my position description.")

14. See, *e. g.*, EEO Counselor's Memorandum of Meeting with Tempi Kern, Nov. 18, 1975, J.App. 39, Adm.R. 66; EEO Counselor's Memorandum of Meeting with Beverly Gerstein, Nov. 19, 1975, J.App. 45, Adm.R. 72.

15. Reviewing Officer's Statement, *supra* note 9, at 1, Adm.R. 113.

16. *Id.*; see EEO Counselor's Memorandum of Meeting with Bart N. Stephens, Oct. 29, 1975, J.App. 35, Adm.R. 62 ("Stephens [said that he] had given [President] nonadministrative assignments and had lost confidence in his ability to handle them.")

17. Performance Rating Report of Samuel R. President, July 25, 1975, Adm.R. 103.

18. *Id.* at 1–3, Adm.R. 103–105. We can only speculate as to President's rating in the seventeenth category because it is not reproduced clearly in the photocopy of the administrative record prepared for this litigation.

19. *Id.*, Narrative Comments on Performance at 6, Adm.R. 112.

Coriden disagreed, however, with Stephens' overall conclusion, stating that "based on Mr. President's background and experience I do not believe he was misassigned but [I believe that he] could have been expected to do the work." [20]

All other employees of CU/ARTS were rated as average to above average in performance.[21] Quite understandably, President was outraged at being evaluated so harshly, and he presented a detailed rebuttal running to nearly 100 pages, including attached exhibits.[22] In his rebuttal, President contended that he had been victimized by racial discrimination in the performance evaluation, and stated his intention to pursue administrative remedies and ultimately file a lawsuit against the Department.[23] On October 17, 1975, Stephens, apparently jarred by the tone of President's rebuttal, submitted eighteen pages of comments in which, to make a long story short, he denied virtually all of President's allegations.[24]

## B. *The Administrative Proceeding*

On October 21, 1975, President conferred with Claudia E. Anyaso, an equal employment opportunity (EEO) counselor at the State Department, and charged that the performance evaluation prepared by Stephens was racially motivated.[25] Subsequently, on December 4, President—then without legal counsel—filed a formal administrative complaint [26] pursuant to Title VII and the implementing civil service regulations.[27] His major charges were that Stephens had discriminated against him on the basis of race in the provision of employment opportunities and in preparing the controversial performance evaluation re-

---

20. Reviewing Officer's Statement, *supra* note 9, at 2, Adm.R. 114.

21. Memorandum of Mark N. Kinsley, May 25, 1976, Adm.R. 101.

22. Rebuttal to Performance Rating Report, Sept. 17, 1975, Adm.R. 116. The exhibits alone consume Adm.R. 126 to 202.

23. *Id.* at 1, Adm.R. 116.

24. Comments on Samuel R. President's Rebuttal to His Performance Rating Report, Oct. 17, 1975, Adm.R. 204.

25. Memorandum of Claudia E. Anyaso to Samuel M. Pinckney, Jr., Feb. 17, 1976, J.App. 28, Adm.R. 55.

26. This was not the first time that President had formally complained of racial discrimination directed toward him. In 1971, President charged discrimination through a number of activities regarding performance evaluation, promotion and demotion. After a hearing in early 1972, the hearing examiner recommended a finding of racial discrimination and various forms of relief. The Department, however, rejected the proposed findings although it implemented some of the proposed relief on other grounds. President exercised his then-existing right of appeal to the Civil Service Commission, see note 27 *infra*, which affirmed the Department's decision. See Attachments to Response of Defendant to Plaintiff's Request for Admissions, Mar. 17, 1977, Record on Appeal (R.) 14. At that time, no clear right of review by a federal court existed, see *Brown v. General Serv. Admin.*, 425 U.S. 820, 826–828,

96 S.Ct. 1961, 1964–1966, 48 L.Ed.2d 402, 407–409 (1976), so President had little choice but to accept the Department's determination.

This earlier administrative proceeding is not, of course, before us for review, but it does serve as an illustration of the kind of dead-ended administrative process that Congress was seeking to eliminate when it amended Title VII in 1972 to broaden the rights of federal employees. See H.R.Rep. No. 92–238, 92d Cong., 1st Sess. 23–26 (1971); S.Rep. No. 92–415, 92d Cong., 1st Sess. 14–17 (1971), U.S.Code Cong. & Admin.News 1972, p. 2137.

27. Complaint of Discrimination in the Federal Government (undated), J.App. 22, Adm.R. 46. See Civil Rights Act of 1964, § 717(b), 42 U.S.C. § 2000e–16(b) (1976) (authorizing Civil Service Commission to promulgate regulations regarding processing of complaints). Between 1972 and 1979, federal employees could appeal adverse agency decisions on discrimination claims to the Commission. *Id.* § 717(c), 42 U.S.C. § 2000e–16(c) (1976). Pursuant to the Reorganization Act of 1977, Pub.L. No. 95–17, 5 U.S.C. §§ 901–912 (Supp. I 1977), effective October 1, 1979, the President transferred the Commission's rulemaking responsibilities and its appellate functions to the Equal Employment Opportunity Commission. Reorganization Plan No. 1 of 1978, § 3, 43 Fed.Reg. 19807–19808 (1978), 92 Stat. 9799 (1978). See Executive Order No. 12106, 44 Fed.Reg. 1053 (1978). The civil service regulations in force in 1975 were identical for all relevant purposes to the current regulations of EEOC, which are set forth at 29 C.F.R. §§ 1613.211 to 1613.222 (1979).

port.[28] In the complaint President requested three remedies:

1. Remove the subjective, racially motivated Performance Rating Report and insert therefor a fair and objective Performance Rating Report. . . .

2. Eliminate the present unwritten policy in CU to eliminate, downgrade, or prevent the promotion of Minority Officers and Employees at the GS–12 [level] or above . . . .

3. Require the Director and Deputy Director [of] CU/ARTS to attend the Department of State's EEO seminars.[29]

The Department thereupon commenced an investigation in an attempt to resolve the complaint and on August 6, 1976, issued its decision. The Deputy Assistant Secretary of State concluded that Stephens had refused to assign to President "the duties and responsibilities of his position."[30] The Deputy Assistant Secretary further found that "there was in the overall job situation *de facto* discrimination against [President] which resulted in unsatisfactory working conditions as well as the Performance Evaluation wrongly predicated upon the situation and the reactions of [President] and his supervisor to it," and that there was "significant evidence that there was discrimination against Mr. President and that remedial action is called for."[31] A three-fold remedy was proposed: that the offending performance evaluation be removed from President's personnel file, that the new deputy director of CU/ARTS—who had not been accused of discriminatory conduct—attend the Department's equal employment opportunity (EEO) seminars, and that President's position be audited with the understanding that he would be reassigned should it be proven that his responsibilities were not at the GS–12 level.[32]

By letter of August 23, 1976, President accepted the finding of discrimination but rejected the remedial steps proposed. He contended that "[t]he remedies and relief granted should be comparable in scope to the remedies and relief required by the Federal Personnel Manual and the Department of State's own regulations," as well as "the remedies required by Title VII."[33] He quoted sections of the Federal Personnel Manual permitting, among other correctives for employment discrimination, retroactive promotion and backpay, or immediate promotion to a new position.[34] In the same letter, he requested a hearing.[35]

---

28. Complaint of Discrimination, *supra* note 27, Attachment A, J.App. 23, Adm.R. 46.

29. *Id.*, Attachment B, J.App. 25, Adm.R. 49. Unlike the remainder of the administrative complaint, Attachment B was apparently prepared and submitted on October 22, 1975, the day after President's meeting with Anyaso. Letter, Samuel R. President to Samuel M. Pinckney, Jr., Deputy Assistant Secretary of State for Equal Employment Opportunity, Feb. 9, 1976, Adm.R. 52.

30. Letter, Samuel M. Pinckney, Jr., to Samuel R. President, Aug. 6, 1976, at 5, J.App. 51.

31. *Id.* at 1–6, J.App. 47–52, Adm.R. 26–31. The investigation also adduced support for some of President's charges of petty discrimination. See, *e. g.*, Memorandum of Mark N. Kinsley and John H. Crandell, May 25, 1976, Adm.R. 294 (President was the only employee of CU/ARTS who was charged with one-quarter hour leave time for each late arrival; no other employee was charged annual leave in quarter hour increments for any reason).

32. Letter, Samuel M. Pinckney, Jr., to Samuel R. President, *supra* note 30, at 6–7, J.App. 52–

53, Adm.R. 31–32. The Deputy Assistant Secretary gave the following reasons for his refusal of relief President had asked for:

1. Because the first remedy requested by [President] suggests that the alleged discriminating official be directed to write a second, more favorable report, the remedy is not acceptable. . . .

2. As there is no evidence that a policy exists in CU to eliminate, downgrade or prevent the promotion of minority officers at the GS–12 level or above etc., this remedy is rejected.

3. The Director [of CU/ARTS] has already attended [the EEO seminars].

*Id.*

33. Letter, Samuel R. President to Samuel M. Pinckney, Jr., Aug. 23, 1976, at 1–2, Adm.R. 24–25.

34. *Id.* See 29 C.F.R. § 1613.271 (1979), discussed *infra* note 67. The applicable regulation in force at the time of the filing of President's administrative complaint was identical to that now in effect.

35. Letter, Samuel R. President to Samuel M. Pinckney, Jr., *supra* note 33.

The Civil Service Commission appointed a hearing examiner and set a hearing for October 18, 1976.[36] On October 12, President wrote to the State Department's chief EEO officer complaining that in a letter to the Commission the Department had "improper[ly] narrowed [the] focus of [his] complaint."[37] In this letter, President apparently tried to clarify any question about what he sought:

> I was included, as well as others, in the remedy that I requested for getting promoted above the GS 12 level by eliminating the present unwritten policy in CU to eliminate, downgrade or prevent the promotion of Minority Officers and Employees at the GS 12 [level] or above. . . .[38]

On October 13, the Department's acting EEO officer responded, agreeing that the hearing was to be confined to the question of remedy.[39] On the same date, President informed the Department that for the first time in the lengthy proceeding he had secured legal representation.[40]

On November 8, 1976, more than 180 days after the filing of the administrative complaint, President instituted this action in the District Court.[41] Two days later, he withdrew his request for an administrative hearing and asked for "a final agency decision based on the record adduced thus far."[42] On November 18, the Department sent President a letter incorporating its final decision—a grant only of the relief set forth in the proposed disposition that President had already rejected.[43]

## C. The District Court Proceeding

President's complaint in the District Court essentially repeated the allegations of its administrative counterpart[44] but was more explicit in its claims for relief. President asked the court to:

> 23. Enter a judgment declaring that the acts and practices of [the Secretary of State] . . . in failing to promote Plaintiff to GS–13 are in violation of the laws of the United States.
>
> 24. Enter a judgment . . . permanently enjoining [the Secretary] from continuing his unlawful discriminatory practices herein enumerated, including but not limited to, the failure to promote Plaintiff to GS–13.
>
> 25. Enter a judgment . . . awarding backpay lost as a result of [the Secretary's] unlawful employment practices. . . .[45]

In due course, President moved for partial summary judgment limited to the judi-

---

**36.** Letter, Paul Streb, EEO Complaints Examiner, to Samuel M. Pinckney, Jr., Oct. 1, 1976, Adm.R. 17.

**37.** Letter, Samuel R. President to Samuel M. Pinckney, Jr., Oct. 12, 1976, Adm.R. 16.

**38.** *Id.*

**39.** Letter, Georgiana M. Prince to Samuel R. President, Oct. 13, 1976, Adm.R. 15.

**40.** Designation of Representative, Adm.R. 14.

**41.** See Civil Docket, *President v. Kissinger*, Civ. No. 76–2075, (D.D.C.), J.App. 3. Original defendants included the members of the Civil Service Commission as well as the Secretary of State, but the Commissioners were later dismissed by consent. Transcript of Oral Argument in the District Court (Tr.) (Dec. 2, 1977) 9.

**42.** Letter, Roma J. Stewart, Counsel for Samuel R. President, to Samuel M. Pinckney, Jr., Nov. 10, 1976, Adm.R. 10.

**43.** Letter, Lawrence S. Eagleburger, Director of Equal Employment Opportunity, Department of State, to Samuel R. President, Nov. 18, 1976, J.App. 55–56, Adm.R. 6–7.

The audit included as part of the administrative relief was ultimately conducted, and it revealed that although President was rated a GS–12 he was only performing the duties of a GS–7. Memorandum from Arthur I. Wortzel to Samuel M. Pinckney, Jr., Feb. 8, 1977, J.App. 81. "This was due to the fact that some of Mr. President's more responsible duties were being performed by other employees within CU/ARTS." *Id.*

**44.** Complaint ¶¶ 11–17, J.App. 9–10. The complaint also included some of the allegations from President's 1971 administrative grievance. See note 26. *supra.*

**45.** Complaint ¶¶ 23–25, J.App. 11.

cial declaration sought.[46] The Secretary subsequently moved (a) for a summary judgment rejecting the request for promotion on the ground that President had not adequately exhausted administrative remedies available for that claim, and (b) for dismissal of the remainder of the litigation.[47] After oral argument, the District Court, in a ruling from the bench, denied President's motion and granted the Secretary's in full.[48] In a subsequent written opinion, the court briefly explained its reasons:

> [T]his Court finds (1) that [President] did not seek promotion to a GS–13 as part of the relief sought in the administrative proceedings and therefore, [President] has failed to exhaust his administrative remedies; (2) that [President] has been granted all of the relief sought in administrative proceedings, and therefore, this portion of [President's] claim is moot; and (3) that [President] is entitled to attorney's fees.[49]

This appeal followed.

## II. LEGAL ANALYSIS

President's primary contentions are that the District Court erred in holding that he

**46.** Plaintiff's Motion for Partial Summary Judgment, J.App. 62.

**47.** Defendant's Motion to Dismiss or in the Alternative for Summary Judgment, J.App. 71.

**48.** Tr. 20.

**49.** Final Order, *President v. Vance, supra* note 2, at 1, J.App. 114.

**50.** To the extent relevant here, § 717(c) provides:

> Within thirty days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection (a) of this section, . . . on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, . . . or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit . . . until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil

had failed to exhaust his administrative remedies with respect to promotion, and in finding the rest of his case moot. In addition, President argues that a declaratory judgment should have been summarily granted in his favor.

### A. *Exhaustion*

■ Section 717(c) of Title VII authorizes a civil action by a federal employee asserting proscribed discrimination,[50] but only after redress has been sought at the hand of the employing agency.[51] More particularly for this case, the employee may sue when more than 180 days have passed since the filing of an administrative complaint without final agency action thereon.[52] Upon timely compliance[53] with these requirements, the aggrieved employee is entitled to a trial *de novo* on the claims.[54]

■ President had not obtained final agency action when, almost two years after filing his administrative complaint, he came into the District Court. Thus, it might appear at first blush that he had fully met Section 717(c)'s exhaustion requirements. The Secretary urges, however, that because President's administrative complaint did not expressly request promotion from GS–

action as provided in section 2000e–5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

42 U.S.C. § 2000e–16(c) (1976).

**51.** See note 50 *supra*; see *Brown v. General Serv. Admin., supra* note 26, 425 U.S. at 832, 96 S.Ct. at 1967, 48 L.Ed.2d at 411 ("[i]nitially, the complainant must seek relief in the agency that has allegedly discriminated against him"); *cf. Love v. Pullman Co.,* 404 U.S. 522, 523, 92 S.Ct. 616, 617, 30 L.Ed.2d 679, 682 (1972).

**52.** See 42 U.S.C. § 2000e–16(c), quoted note 50 *supra.* As we stated in *Grubbs v. Butz,* 169 U.S.App.D.C. 82, 87, 514 F.2d 1323, 1328 (1975), a complainant may sue in federal court "after fulfilling all the prerequisites to suit specified by [Title VII] and, most importantly, after 180 days have elapsed without final administrative action."

**53.** See note 50 *supra.*

**54.** *Chandler v. Roudebush,* 425 U.S. 840, 96 S.Ct. 1949, 49 L.Ed.2d 416 (1976).

12 to GS–13 as part of its prayer for relief, he was precluded from seeking that type of redress in a civil action.[55] The District Court accepted this contention, but we disagree. The complaint and other documents in the administrative record were more than adequate to put the State Department on notice that President believed that he had been subjected to racial discrimination adversely affecting his promotional opportunities, and that he considered promotion to GS–13 an appropriate form of relief.

President's complaint alleged that the Department pursued a policy of not promoting minority officers in CU above the GS–12 level, and that he himself had been victimized by a biased performance evaluation report.[56] It strains credulity to suggest that these straightforward charges were not sufficient to alert an experienced and conscientious equal employment opportunity officer to a claim that President had been discriminated against in his promotional opportunities. He was a minority officer in CU and, if an anti-promotional policy affecting minority officers were proven, he obviously was among its potential victims. And it is impossible to conceive of an inferior performance evaluation as other than a detriment to promotion.[57]

Even had it not been entirely clear from the face of the complaint that President sought promotion as part of his remedy, the Department certainly was told during the course of the administrative proceeding,

and well before it issued its final decision, that President's claims were based in part upon a belief that he had been discriminated against in his chances for promotion. The administrative record includes a memorandum in which the EEO counselor who originally heard and investigated President's complaint stated that he had "assert[ed] that the effect of the [biased] performance rating would be to hamper the promotion opportunities of a qualified minority officer." [58] And in President's letter rejecting the Department's proposed relief, he expressly referred to "the remedy that I requested for getting promoted above the GS 12 level." [59]

In the face of these positive indications that the Department was on notice that promotion was an issue, the Secretary nevertheless insists, and the District Court held, that President had not adequately raised the question of promotion in the administrative proceeding. Simply put, the position seems to be that an aggrieved employee may not litigate promotional discrimination in court unless at the administrative level he sought promotion to a specific position or grade.[60] We think so strict a requirement would impose far too heavy a burden upon a lay complainant, and far too little responsibility on the agency, particularly one that has admitted its own wrongdoing.

Pertinent legislative history teaches that when Congress amended Title VII in 1972

---

**55.** See, *e. g.*, Brief for Appellee at 6 ("[a]t no time during the investigation of [President's] complaint . . . did [he] ever indicate that he sought promotion to GS–13"); *id.* at 11 ("question of [President's] promotion was nowhere even posed"). The Secretary urges that we not find "that a request for promotion was present below *ab ovo*, albeit couched as an inchoate complaint about appellant's diminished 'promotional opportunities.'" *Id.* at 9.

**56.** See text accompanying note 29 *supra*.

**57.** Under then-applicable federal law, the purpose of the performance rating was to "recogniz[e] the merits of employees." 5 U.S.C. § 4302 (1976). Agencies were required to supply performance ratings in at least three categories: satisfactory, unsatisfactory, and outstanding, 5 U.S.C. § 4304(a) (1976), and "[a] performance rating of unsatisfactory [was] a

basis for removal from the position in which the performance was unsatisfactory," 5 U.S.C. § 4304(b) (1976). These statutes have been completely rewritten in Pub.L. No. 95–454, § 203(a), 92 Stat. 1111, 1131–1135 but in judging whether a biased performance evaluation had a detrimental effect on promotion, the important consideration, of course, is the evaluation's legal effect at the time, and not its effect under present law.

**58.** Memorandum of Claudia E. Anyaso to Donald C. Liedel, Director of CU, Nov. 11, 1975, at 1, Adm.R. 74.

**59.** See text accompanying note 38 *supra*.

**60.** See note 55 *supra*.

to cover federal as well as private-sector employees, it was mindful that ofttimes administrative complaints would be lodged by lay persons without benefit of legal assistance.[61] By insisting in Section 717(c) that a complaining employee seek relief within his agency in the first instance, Congress made certain that the agency would have the opportunity as well as the responsibility to right any wrong that it might have done. Congress did not, however, intend to erect a massive procedural roadblock to access to the courts. On the contrary, far from hampering resort to these potential forums for resolution of discrimination claims, Congress contemplated that the exhaustion doctrine would be held within limits consonant with the realities of the statutory scheme.[62]

In the context of private-sector employment discrimination, the Supreme Court has held that Title VII's exhaustion requirement should not be read to create useless procedural technicalities; "[s]uch technicalities," the Court admonished, "are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process."[63] Similarly, this court has declared that administrative complaints by private-sector employees "are to be construed liberally since very commonly they are framed by persons unschooled in technical pleading."[64] Other circuits have articulated similar conclusions respecting the specificity with which a private-sector employee must draft his administrative complaint.[65] Federal employees face identical obstacles, and we perceive no reason whatsoever for subjecting them to disparate treatment.[66]

We cannot agree then, that the Department lacked adequate notice that President desired promotion. It cannot reasonably be expected that a lay complainant will always

---

**61.** In extending the period for filing an administrative employment-discrimination complaint from 90 to 180 days after the alleged act of discrimination occurs, Congress was guided by the lay complainants' lack of expertise:

> It is intended by expanding the time period for filing charges in this subsection that aggrieved individuals *who frequently are untrained laymen who are not always aware of the discrimination which is practiced against them*, should be given a greater opportunity to prepare their charges and file their complaints, and that existent but undiscovered acts of discrimination should not escape the effect of the law through a procedural oversight.

Section-by-Section Analysis of S. 2515, The Equal Employment Opportunities Act of 1972, 118 Cong.Rec. 4940, 4941 (1972) (emphasis added). See also S.Rep. No. 92–415, *supra* note 26, at 27. We ourselves have recognized that solicitude for the welfare of the unrepresented complainant pervades the statutory scheme. *Bell v. Brown,* 181 U.S.App.D.C. 226, 230–231, 557 F.2d 849, 853–854 (1977); *Coles v. Penny,* 174 U.S.App.D.C. 277, 283, 531 F.2d 609, 615 (1976).

**62.** As we stated in *Grubbs v. Butz, supra* note 52, 169 U.S.App.D.C. at 87, 514 F.2d at 1328, "the Act is in part a response to Congressional realization that 'the doctrine of exhaustion of remedies . . . had become [a] barrier to meaningful court review'" (quoting *Hackley v. Johnson,* 360 F.Supp. 1247, 1251 (D.D.C.1973), *rev'd sub nom. Hackley v. Roudebush,* 171 U.S. App.D.C. 376, 520 F.2d 108 (1975) (footnote omitted)); see also S.Rep. No. 92–415, *supra*

note 26, at 16; H.R.Rep. No. 92–238, *supra* note 26, at 22–26.

**63.** *Love v. Pullman Co., supra* note 51, 404 U.S. at 526–527, 92 S.Ct. at 619, 30 L.Ed.2d at 684–685.

**64.** *Shehadeh v. C & P Tel. Co.,* 193 U.S.App. D.C. 326, 342, 595 F.2d 711, 727 (1978).

**65.** See, *e. g., Russell v. American Tobacco Co.,* 528 F.2d 357, 365 (4th Cir. 1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1666, 1667, 48 L.Ed.2d 176 (1976); *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 462, 464 (5th Cir. 1970); *Tipler v. E. I. duPont de Nemours & Co.,* 443 F.2d 125, 131 (6th Cir. 1971); *Waters v. Heubelin, Inc.,* 547 F.2d 466, 468 (9th Cir. 1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977). As the Fifth Circuit observed in *Sanchez,* "the specific words of the [administrative] charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow." 431 F.2d at 465.

**66.** Had President been a private-sector employee filing a complaint with EEOC rather than an employee of the Federal Government filing the identical complaint with the employing agency, there would have been little question as to the availability of promotion as a remedy in his civil action. We are unable to discern in the text or legislative history of § 717 anything indicating that when Congress extended Title VII coverage to federal employees, in 1972, it intended to draw any such distinction.

phrase his prayer for relief so narrowly as to leave no question about what he seeks; indeed, he may not even be aware of all of his legal rights or available remedies. Once discrimination has been demonstrated, a respectable part of the burden of fashioning suitable relief must shift to the discriminating agency lest the ultimate goal of Title VII be frustrated.[67]

Properly understood, the exhaustion rule does not point to a different conclusion. It is not an end in itself; it is a practical and pragmatic doctrine that "must be tailored to fit the peculiarities of the administrative system Congress has created."[68] Exhaustion under Title VII, like other procedural devices, should never be allowed to become so formidable a demand that it obscures the clear congressional purpose of "rooting out . . . every vestige of employment discrimination within the federal government."[69] We think that wholesome objective would be disserved by requiring in the name of exhaustion more of President than he already has done.

### B. *Mootness*

The District Court also held that any further claim envisioned by President was moot because all other relief sought had been granted.[70] That ignores an issue on whether all relief awarded has actually been implemented. The question on that score is one of fact, and here the fact is in dispute.

In support of their cross-motions for summary judgment, both parties filed statements of the facts they deemed uncontested.[71] The Secretary's filing asserted that "[a]ll duties for a validly classified Civil Service grade GS–12 position have been restored to plaintiff and he is presently performing those duties."[72] The Secretary attempted to undergird this position by two affidavits, one rather conclusory[73] and the

---

**67.** Our conclusion that Congress must have intended the agency to share the task of determining appropriate relief is buttressed by an examination of the regulations issued by the Civil Service Commission while it was the primary overseer of Title VII compliance in the Federal Government. That role has since been reassigned to EEOC, see note 27 *supra*, but the original regulation concerning remedies, 5 C.F.R. § 713.271(b) (1977), remains today in identical language, 29 C.F.R. § 1613.271(b) (1979). Once wrongdoing has been shown, it places the bulk of the responsibility for making the complainant whole on the agency involved.

This section makes no reference whatsoever to the employee's complaint. It nonetheless directs that "remedial action" shall be taken whenever "an agency, or the Commission, finds that an employee of the agency was discriminated against and as a result of that discrimination was denied an employment benefit, or an administrative decision adverse to him was made." *Id.* The regulation explicitly refers to five potential remedies: retroactive promotion and backpay, preferential consideration for promotion, cancellation of discriminatory personnel actions, expunction from the aggrieved individual's personnel file of any reference to discriminatory actions, and opportunity to participate in a previously-denied benefit. *Id.*

Thus, so far as the Civil Service Commission was concerned, the Act means that once a charge of discrimination has been proven the agency must act—on its own initiative if necessary—to provide appropriate relief. And because the Commission was the body originally charged by Congress with overseeing the operation of Title VII in the Federal Government, its interpretation is entitled to considerable weight. *E. g., Griggs v. Duke Power Co.,* 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158, 165 (1971) (giving similar weight to EEOC interpretations in the private sector). The weight should be all the greater when, as here, "the Act and its legislative history support the Commission's construction." *Id.* at 434, 91 S.Ct. at 855, 28 L.Ed.2d at 165–166.

**68.** *McKart v. United States,* 395 U.S. 185, 195, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194, 203 (1969).

**69.** *Hackley v. Roudebush, supra* note 62, 171 U.S.App.D.C. at 404, 520 F.2d at 136.

**70.** See text. *supra* at note 49.

**71.** "With each motion for summary judgment . . . there shall be served and filed . . . a statement of the material facts as to which the moving party contends there is no genuine issue . . . ." D.D.C. Rule 1–9(h).

**72.** Secretary's Statement of Material Facts, at 5, ' 11, J.App. 78.

**73.** Affidavit of John A. Burroughs, Jr., J.App. 72, who apparently had replaced Pinckney during the course of the litigation. The affidavit simply stated Burroughs' position with the Department, averred his familiarity with the action, then added:

other more detailed.[74] President, however, presented two counter-affidavits of his own, each containing a point-by-point denial of the relevant facts alleged in the Secretary's affidavits.[75] It is thus evident that the controversy over restoration of the grade GS–12 duties is not moot.

C. *Relief*

 President is entitled to a trial *de novo* in the District Court on two issues:

restoration of duties to his GS–12 position and promotion. As long as material facts remain in dispute, he is not, however, entitled to summary relief.[76] Nor, contrary to President's position,[77] until he has established by evidence a prima facie case of discrimination will the burden of proof shift to the Secretary.[78] Should, however, he prevail at trial on one or both issues, the District Court will fashion appropriate relief.[79]

4. *As specified in* [*the final-decision*] letter, the following actions have been taken: a. Mr. President's performance evaluation for the period September 15, 1974 to June 15, 1975[,] the related rebuttal statement, and the response to that rebuttal have been removed from Mr. President's official personnel file; b. The new Deputy Director of the Office of CU/ARTS has attended briefings offered by the Department of State to its employees on Equal Employment Opportunity; and c. The Bureau of Cultural Affairs (CU) has restored to Mr. President's position duties found by audit to be missing from that position, so that Mr. President is and has been able to perform duties at the GS–12 level. *Id.* at 1–2, J.App. 72–73. The affidavit alleged no details of the duties purportedly restored to President's position nor of his performance of those duties.

**74.** Affidavit of Valentine E. Scalise, J.App. 119.

**75.** Affidavits of Samuel R. President, J.App. 101, 134.

**76.** See Fed.R.Civ.P. 56(c). President urges that he is entitled as a matter of right to summary judgment on his request for a declaratory judgment on the issue of discrimination. Brief for Appellant at 11–13. That argument must be rejected, for it is well settled that a declaratory judgment always rests within the sound discretion of the court. See *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620, 1625 (1942); *Hanes Corp. v. Millard*, 174 U.S.App.D.C. 253, 259, 531 F.2d 585, 591 (1976); 10 C. Wright & A. Miller, Federal Practice § 2759 (1973). The question, properly put, is whether a declaratory judgment should follow as a matter of discretion.

The usual practice on appeals from denials of declaratory judgments is for the appellate court to substitute its own judgment for that of the trial court. See 6A Moore's Federal Practice ¶ 57.08[2], at 57–37 n. 8 (1979) (citing cases). This court has never expressly adopted that standard. *Cf. Hanes Corp. v. Millard, supra*, 174 U.S.App.D.C. at 259, 531 F.2d at 591 (noting that "[a] number of courts and commentators" take this view). But even taking that course, we would not disturb the District Court's conclusion.

It has authoritatively been stated that a declaratory judgment will ordinarily be granted only when it will either "serve a useful purpose in clarifying the legal relations in issue" or "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." E. Borchard, Declaratory Judgments 299 (2d ed. 1941). This test has been adopted by several of the federal courts of appeals. See, *e. g., Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969), *cert. denied*, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970); *Alsager v. District Ct. of Polk County*, 518 F.2d 1160, 1163–1164 (8th Cir. 1975); *McGraw-Edison Co. v. Preformed Line Prods. Co.*, 362 F.2d 339, 342 (9th Cir.), *cert. denied*, 385 U.S. 919, 87 S.Ct. 229, 17 L.Ed.2d 143 (1966). In the instant litigation, a declaratory judgment would serve neither purpose. It would not clarify the legal issues in any sense because the Department has never challenged the finding of discrimination against President and it made that finding itself. See text *supra* at notes 30–32, 43. A declaratory judgment similarly would not end any of the controversy, for it is sought on the single issue as to which there is no controversy.

**77.** Brief for Appellant at 19–21.

**78.** In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973), the Supreme Court set forth the criteria to be met in establishing a prima facie case of discrimination under Title VII:

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained opened and the employer continued to seek applicants from persons of complainant's qualifications.

While the literal language of that standard does not fit an issue of promotion without some modifications, the Court recognized its flexibility for service as the gauge in varying factual situations. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n.

prevail at trial on one or both issues, the District Court will fashion appropriate relief.[79]

To the extent that the District Court's order denied President's motion for summary judgment, it is affirmed. In all other respects the order is reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

13, 36 L.Ed.2d at 677–678 n. 13. So adopted the *McDonnell Douglas* test has been utilized in cases involving a charge of discrimination in promotion. See, *e. g., Day v. Mathews,* 174 U.S.App.D.C. 231, 233, 530 F.2d 1083, 1085 (1976); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 259–260 (5th Cir. 1974).

**79.** See Part II(A) *supra.*