Lee V. LANGSTER, Plaintiff,

v.

Richard SCHWEIKER, in his capacity as Secretary of the United States Department of Health and Human Services; Julius Berman, both individually and in his former capacity as Director of the Great Lakes Program Service Center of the United States Social Security Administration; Leeman Forrest, both individually and in his capacity as Director of Management for the Great Lakes Program Service Center of the United States Social Security Administration; and Juanita Carothers, both individually and in her capacity as Assistant Director of Management for the Great Lakes Program Service Center of the United States Social Security Administration, Defendants.

No. 80 C 6393.

United States District Court, N.D. Illinois, E.D.

April 29, 1983.

Lee V. Langster, James A. Clark, Schiff, Hardin & Waite, Chicago, Ill., for plaintiff.

Dan K. Webb, U.S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff Lee V. Langster brings this action under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, and the First and Fifth Amendments to the Constitution, seeking back pay and damages arising from his non-selection for the position of Equal Opportunity Coordinator at the Great Lakes Program Service Center ("Great Lakes") of the United States Social Security Administration ("SSA"). Defendants are Richard Schweiker, in his official capacity as Secretary of the United States Department of Health and Human Services, Julius Berman ("Berman"), both individually and in his official capacity as Director of Great Lakes; Leeman Forrest, ("Forrest") both individually and in his official capacity as Director of Management at Great Lakes; and Juanita Carothers ("Carothers"), both individually and in her capacity as Assistant Director of Management.

As gleaned from the complaint, memoranda and exhibits, the following facts form the basis of this action. Between 1955 and 1981 plaintiff, a black male, was employed by Great Lakes ostensibly as a "claims adjuster," at the GS–10 salary level. Pursuant to a collective bargaining agreement, however, Langster spent all of his on-the-job time since September 1968 performing the responsibilities of his position as executive vice-president of Local 1395 of the American Federation of Government Employees. Among plaintiff's duties in this role was prosecution of grievances of union members, including charges of employment discrimination.

In December of 1975 the SSA invited applications for the newly created position of Equal Opportunity Coordinator, to be initially salaried at a GS–11 grade. Plaintiff applied for this position and was placed fifth on a list of those believed "best qualified for the job."[1] Most persons on this list were interviewed by a panel of Great Lakes managerial employees; plaintiff and one other applicant were interviewed only by Juanita Carothers. Carothers passed along

---

1. Included among the factors considered in compiling point scores to evaluate applicants was the employee's job performance appraisal. Plaintiff alleges that Berman, Forrest and Carothers knew or should have known that plaintiff's job performance appraisal had not been updated since 1968, when he began devoting 100% of his time to his union activities. Ignoring the job performance appraisal, plaintiff alleges that he would have been ranked first among those named to the "best qualified" list.

her evaluation of Langster to Julius Berman, who, in consultation with Leeman Forrest, selected a female for the position.

Complaining of his failure to receive the promotion, plaintiff filed an administrative charge of discrimination on July 21, 1976, which was subsequently dismissed in March 1978, after an investigation by the Department of Health, Education and Welfare. Still pursuing his administrative remedies, plaintiff requested and received a full hearing before a complaint examiner. After the examiner found "no discrimination by reason of sex, age or reprisal" (Plaintiff's Exhibit D) Langster brought this suit in federal court.

The first amended complaint is in five counts. In Count I plaintiff alleges that Carothers' negative evaluation of him was a result of retaliation for his union activities, in violation of Title VII, 42 U.S.C. § 2000e–16(a). More specifically, plaintiff states that Carothers disliked him because of numerous actions he had taken pursuant to his duties as executive vice-president of Local 1395, including challenging her appointment as assistant director of management and prosecuting a complaint against her on behalf of another employee.

Count II alleges that the management of Great Lakes engaged in a pattern or practice of discrimination against black males in making promotions; that defendant's choice of a female for the position plaintiff sought constitutes discrimination based on sex and race, and that both forms of discrimination are proscribed by Title VII. In Count III plaintiff avers that the management of Great Lakes engaged in a pattern or practice of discriminating against persons over age 40 in selecting employees for promotion. Since plaintiff was over forty at the time the complained-of conduct occurred, and the person chosen for the position was 36, plaintiff alleges that his non-selection was due to his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 633a(a).

Counts IV and V are related insofar as both attempt to state a cause of action under the principles set forth by the Supreme Court in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Plaintiff alleges in Count IV that the reprisals outlined in Count I were also intended to punish him for participating in activities protected by the First Amendment and thus are unconstitutional. Count V, tracking the allegations in Count II, alleges that the pattern or practice of discrimination against black males is actionable directly under the Fifth Amendment.

Finally, in addition to back pay, an increase in pension benefits, fees and costs, plaintiff seeks punitive damages of $100,000 from Berman, Forrest and Carothers in their individual capacities.

In response to these allegations defendants have filed four motions:[2] (1) a motion to strike allegations of race discrimination; (2) a motion to dismiss the complaint as it concerns Berman, Forrest and Carothers; (3) a motion to strike the prayer for punitive damages; and (4) a motion to strike the jury demand. As plaintiff notes, the last three will be considered together since they all turn on the same question—the sufficiency of the allegations in Counts IV and V.

### I. Motion to Strike the Allegations of Racial Discrimination

Defendants contend that any allegations of race discrimination in Counts II and V should be stricken because plaintiff did not allege race discrimination in his administrative complaint filed with the EEOC on July 21, 1978. A failure to exhaust administrative remedies bars plaintiff from raising the question of racial discrimination in this court.

It is true that both private and government employees must first present

---

**2.** Although defendant labels the first motion "a motion to strike allegations of race discrimination," since both sides go beyond the complaint and rely on exhibits, it will be considered a motion for summary judgment.

their grievances in an administrative forum so that the agency has an opportunity to rectify any discrimination that may have occurred. At the same time, this exhaustion requirement should not be read to create useless procedural technicalities, which are "particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process." *Love v. Pullman Co.,* 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972).[3] Thus, administrative complaints are to be construed liberally, in accordance with the remedial purpose of Title VII, as well as the objectives of the exhaustion doctrine. In the context of this case these principles translate into the following inquiry: did the agency consider the possibility that race played a part in plaintiff's failure to be promoted, regardless of plaintiff's "literary acumen," or lack thereof, in stating the claim in his administrative complaint. *See Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 465 (5th Cir. 1970).

The charge filed with the EEOC concededly had mixed signals. On the one hand, plaintiff clearly indicates in his answer to item 6 that he believed he was discriminated against because of his race. On that line plaintiff was asked the basis for the discriminatory conduct, and he typed "sex, age and color," and stated that he was black, male and age 49. In other parts of the complaint, however, plaintiff just as clearly ascribes the discrimination as being a result only of his sex, age, and in retaliation for filing other complaints—omitting any mention of race. (See Plaintiff's Exhibit A.)

While the complaint, therefore, is not a model of clarity, the answer to item 6 put the agency on notice as to plaintiff's claims based on race. More importantly, the administrative record discloses that the agency investigated the allegation of racial discrimination. In his final report the director of the special staff for equal opportunity of the (then) Department of HEW concluded that "the evidence does not support Mr. Langster's allegations of *racial,* sex and/or age discrimination or occupational reprisal in the promotion actions about which he is concerned."[4] (Plaintiff's Exhibit C.) (Emphasis supplied).

It is somewhat troubling that during a formal administrative hearing—requested by plaintiff after the issuance of the adverse final report—the question of race discrimination was never adjudicated. Rather, the sole cause for plaintiff's non-promotion discussed at that hearing was discrimination due to sex, age and reprisals. It may well be that plaintiff did not consider his racial discrimination claim as particularly persuasive because the selectee was black. Be that as it may, this court concludes that the agency had sufficient opportunity to consider the claim of race discrimination, whether or not persuasive, so that the objectives of the exhaustion doctrine have been satisfied. "Exhaustion under Title VII, like other procedural devices, should never be allowed to become so formidable a demand that it obscures the clear Congressional purpose of 'rooting out ... every vestige of employment discrimination within the federal government.' We think that wholesome objective would be disserved by requiring in the name of exhaustion more than [has already been done]." *President v. Vance,* 627 F.2d 353, 363 (D.C.Cir.1980) (footnotes omitted).[5]

**3.** This liberality is the same regardless of whether the employee is in the private sector or is a government worker. *See President v. Vance,* 627 F.2d 353, 362 (D.C.Cir.1980). *Cf. Clark v. Chosen,* 619 F.2d 1330 (9th Cir.1980).

**4.** At the same time that Langster filed the charge of discrimination at issue in this case, he also filed a second charge challenging his failure to be promoted to the position of Social Insurance Specialist. The two charges were consolidated for purposes of administrative review. It is clear, however, that the agency considered the claim of *race* discrimination with respect to the EEO Specialist position. *See* Plaintiff's Exhibit C, ¶ b, p. 2.

**5.** Permitting plaintiff to proceed with pressing his claim in federal court does not, of course, imply approval of the merits of his claim. Indeed, it is likely that Langster will have difficulty sustaining his charge of racial discrimination since it was a *black* female appointed to the position to which he aspired. Contrary to defendant's intimation, however, the fact that a black was appointed does not, by itself, defeat

II. *Motions to Dismiss Individual Defendants, to Strike the Prayer for Punitive Damages and to Strike the Jury Demand*

■ Plaintiff, at least implicitly, concedes that were he alleging claims only under Title VII and the ADEA, he would have no right to a jury trial, nor would he be entitled to punitive and exemplary damages. *See Great American Savings & Loan Ass'n. v. Navotny,* 442 U.S. 366, 375, 99 S.Ct. 2345, 2350, 60 L.Ed.2d 957 (1979) (jury trial is not available under Title VII); *Lehman v. Nakshran,* 453 U.S. 156, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981) (trial by jury in an action against the federal government is not permitted under ADEA). Further, in civil actions based on discriminatory practices by a federal agency, the only proper party defendant is the head of the involved agency, and thus claims against Carothers, Berman and Forrest would be impermissible. 42 U.S.C. § 2000e–16(c). *See Newbold v. United States Postal Service,* 614 F.2d 46 (5th Cir.), *cert. denied,* 449 U.S. 878, 101 S.Ct. 225, 66 L.Ed.2d 101 (1980); *Hackley v. Roudebush,* 520 F.2d 108 (D.C.Cir.1975); *Carver v. Veterans Administration,* 455

F.Supp. 544 (E.D.Tenn.1978); *Brooks v. Brinegar,* 391 F.Supp. 710 (W.D.Okl.1974). Under Counts IV and V, however, plaintiff argues that he may proceed against individual defendants, can request punitive damages and is entitled to a trial by jury. Accordingly, resolution of these motions centers on the viability of these latter two counts. And whether plaintiff states a *Bivens* cause of action in these counts turns on two issues. First, are the claims in Counts IV and V preempted by the holding in *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 1961 (1976)? If not, should the court imply a cause of action under *Bivens* ? The first question relates to pre-emption of existing remedies; the second relates to the implication of remedies. While the factors which bear upon both are in many respects similar, they are separate concepts.

In *Brown,* the Court considered whether § 717 of Title VII is the exclusive judicial remedy for government workers aggrieved by employment discrimination. The plaintiff in *Brown,* a federal employee allegedly denied a promotion because of his race, sued his agency and his superiors under Title VII

plaintiff's *prima facie* case of discrimination under *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972). In *McDonnell-Douglas,* the Supreme Court set forth an outline of the elements of a *prima facia* case of employment discrimination:

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a *prima facia* case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824.
After the plaintiff establishes a *prima facie* case of discrimination the burden then shifts to the defendant to show some legitimate, non-discriminatory reason for its conduct. If the defendant meets this burden the presumption raised by the plaintiff's *prima facia* case is rebutted and the plaintiff must then prove by a preponderance of evidence that the offered reason was merely a pretext for discriminatory action. *See Texas Department of Community*

*Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
The Court in McDonnell recognized that the "facts necessary will vary in Title VII cases, and the specification above of the *prima facia* proof required from respondent is not necessarily applicable in every respect to differing factual situations." *Id.* at 802 n. 13, 93 S.Ct. at 1824, n. 13. Thus, the fact that a member of plaintiff's minority group received the promotion that plaintiff desired does not, *a fortiori,* amount to a failure to establish a *prima facia* case in every circumstance. *Ashagre v. The Southland Corporation,* 546 F.Supp. 1214 (S.D. Tex.Sept. 8, 1982). Compare *Coleman v. Braniff Airlines, Inc.,* 664 F.2d 1282 (5th Cir.1982) (no *prima facia* case when black's former position filled by other blacks) *with Jones v. Western,* 669 F.2d 280 (5th Cir.1982) (replacement by another minority may be a pretextual device designed to disguise the act of discrimination.) *Cf. DeLesstine v. Fort Wayne State Hospital,* 682 F.2d 130 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 378, 74 L.Ed.2d 511 (1982). Consequently, it cannot be determined at this juncture, based on the dearth of argument by either side, whether plaintiff can ultimately prevail in establishing a *prima facia* case.

and under the Civil Rights Act of 1866, 42 U.S.C. § 1981. After examining the legislative history of § 717, and its carefully designed administrative and judicial scheme, the Court dismissed the § 1981 claim and, with it, the suit: [6]

> The balance, completeness, and structural integrity of § 717(c) are inconsistent with the petitioner's contention that the judicial remedy afforded by § 717(c) was designed merely to supplement other putative judicial relief. This view fails, in our estimation, to accord due weight to the fact that unlike these other supposed remedies, § 717(c) does not contemplate merely judicial relief. Rather, it provides for a careful blend of administrative and judicial enforcement powers. Under the petitioner's theory, by perverse operation of a type of Gresham's law, § 717, with its rigorous administrative exhaustion requirements and time limitations, would be driven out of currency were immediate access to the courts under other, less demanding statutes permissible. The crucial administrative role that each agency together with the Civil Service Commission was given by Congress in the eradication of employment discrimination would be eliminated "by the simple expedient of putting a different label on [the] pleadings." *Preiser v. Rodriguez,* 411 U.S. 475 [93 S.Ct. 1827, 36 L.Ed.2d 439] (1973). It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough scheme to be circumvented by artful pleading.

*Brown v. GSA, supra,* 425 U.S. at 829, 96 S.Ct. at 1966. *See Torre v. Barry,* 661 F.2d 1371, 1374 (D.C.Cir.1981). *Cf. Ruth Anne M. v. Alvin Independent School Dist.,* 532 F.Supp. 460, 474–75 (S.D.Tx.1982); *Giles v. EEOC,* 520 F.Supp. 1198, 1200 (E.D.Mo. 1981).

While *Brown,* by its terms, does not deal with whether Title VII also excludes *constitutional* claims concerning federal employment discrimination, *Dearsman v. Kurtz,* 516 F.Supp. 1255 (D.D.C.1981), the decision has been broadly construed by numerous lower courts to preclude Bivens-type claims. *Id.* at 1259, and cases cited therein. *See also Cagan v. United States Postal Service,* No. 81–0032–F (D.Mass. December 13, 1982); *White v. GSA,* 652 F.2d 913, 917 (9th Cir.1981); *Lawrence v. Staats,* 665 F.2d 1256, 1259 (D.C.Cir.1981); *Caton v. Canal Zone Gov't,* 522 F.Supp. 1 (D. Canal Zone, 1981) *aff'd* 669 F.2d 218 (5th Cir.1982); *Royal v. Bergland,* 428 F.Supp. 75 (D.C.Cir. 1977), *cert. denied,* 434 U.S. 883, 98 S.Ct. 253, 54 L.Ed.2d 169 (1978).

■ Nonetheless, plaintiff argues that the decision in *Brown* does not bar Counts IV and V. First, plaintiff contends that even the most expansive readings of *Brown* do not interpret it to preclude remedies for conduct *beyond* the scope of Title VII. *White v. GSA, supra* at 917. *See Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). Since Carothers' retaliation may stem from her personal dislike of plaintiff because of his advocacy of contract positions as a union representative and, thus, is not remediable under Title VII, plaintiff argues that Count IV offers an alternative theory of recovery that should not be dismissed as preempted under *Brown.*

Additionally, plaintiff suggests that *Brown* does not bar either count since the reasoning expressed by the Court is inapplicable to claims against *individual* defendants.

With respect to the first issue, this court finds that § 717 does not preempt causes of action for which it does not provide a remedy. *See Sonntag v. Dooley,* 650 F.2d 904 (7th Cir.1981). A constitutional claim may not be remediable under Title VII in one of three situations. First, the constitutional claim may stem from a totally distinct inci-

---

**6.** The plaintiff in *Brown* had not filed his Title VII suit in federal court within the requisite thirty days. That claim had been dismissed by the district court and the dismissal was affirmed on appeal. The only question before the Supreme Court was the viability of the § 1981 claim.

dent than the statutory one, and thus the two are joined together solely for convenience. For example, an employer may deny an employee a promotion due to race, and subsequently may fire that worker for exercising his First Amendment rights. In these circumstances two separate, unrelated causes of action are presented, and the existence of a Title VII claim has no effect on the constitutional question.

Alternatively, the claims may arise out of the same conduct and state different but consistent theories for relief. Counts II and V of the case at bar illustrate this scenario. Count II states that plaintiff's non-promotion was due to racial animus in violation of Title VII; Count V characterizes these same actions as being violative of the Fifth Amendment. The case law is clear that the constitutional claim is preempted as against the Secretary. Since the remedy requested in Count V can be secured by Count II, plaintiff is limited under *Brown* to seeking relief under Title VII. (Plaintiff's argument that Count V states a claim nonetheless because *Brown* does not preempt causes of action against *individual* defendants will be discussed on pp. 414–416, *infra.*)

Finally, the claims may arise out of the same conduct, but state different and contradictory theories for relief. In the instant case Counts I and IV represent this alternative. Count I alleges that Carothers' retaliatory conduct arose from her animus towards plaintiff's employment discrimination activities—conduct proscribed by Title VII. On the other hand, Count IV, at least in part, attributes her actions to personal dislike arising out of plaintiff's protection of contract rights, and this dislike does not amount to a motivation made unlawful by Title VII. The role of the preemption doctrine in such a setting is arguably more difficult to resolve than for the other two scenarios. To permit a party to assert a different, albeit related claim when Title VII may provide the requested relief, circumvents the elaborate administrative mechanism established by Congress to deal with discriminatory conduct. Nonetheless, forcing a plaintiff to choose one or the other theory, at the risk that *no* relief will be accorded, is nowhere mandated by the statute or the *Brown* analysis. As the Supreme Court noted in *Davis v. Passman, supra,* 442 U.S. at 247, 99 S.Ct. at 2278: "There is no evidence ... that Congress meant to foreclose alternative remedies available to those not covered by the statute." *See also Carter v. Marshall,* 457 F.Supp. 38, 17 FEP Cases 1182, 1185–86 (D.D.C.1978); *Berio v. EEOC,* 446 F.Supp. 171, 174 (D.D.C.1978).

Thus, to the extent that Count IV seeks relief from conduct beyond the scope of Title VII, no preemption can be implied. As indicated earlier, however, part of Count IV and all of Count V state claims fully remediable by Title VII.[7] The validity of these claims thus turns on whether, under *Brown,* Title VII preempts causes of action against defendants in their *individual* capacities.

Plaintiff contends that neither the legislative history nor the structure of the 1972 Amendments to Title VII support extending the reach of *Brown* to preempt *Bivens* suits against individuals. The recurrent theme of the legislative history, plaintiff suggests, is that federal employees lacked a judicial remedy for discriminatory acts because of defenses available only to the *government,* such as sovereign immunity. In fact, plaintiff argues, both the Senate and House reports emphasize that the problem addressed by § 2000e–16 was the systematic barriers to equal opportunity rather than individual bad faith acts of discrimination. *See* S.Rep. No. 92–415, 92d Cong. 1st Sess. (1971); H.R.Rep. No. 92–238, 92d Cong., 1st Sess. (1971), U.S.Code Cong. & Admin.News 1972, p. 2137. Plaintiff thus concludes:

If as the Supreme Court has held, the legislative history reveals a Congressional belief that the victims of federal employment discrimination lacked an alternative to Title VII at the time of its passage, it

---

**7.** Defendants do not contend that there was an administrative process at that time to redress

the union action claim plaintiff appears to advance.

is clear that Congress was only concerned with the matter insofar as such persons were seeking relief against the government. The question of the relief that was or should be available in suits brought against individual officers of the government who had discriminated in employment was not at issue in 1972 and, hence, not foreclosed by the legislation passed at that time.

Plaintiff's Response to Defendants' Motions to Strike and Dismiss, at 24–25.

Second, plaintiff points to the fact that the statute only permits suits against the head of the department, agency or unit that has violated the Act. 42 U.S.C. § 2000e–16(c). Thus, individuals who discriminate can only be held responsible for their conduct insofar as they can be sued on a theory other than Title VII. To hold such alternate remedies preempted is to grant absolute immunity to even the "most heinous discriminator." According to plaintiff, the suggestion that Congress intended this result is a "proposition implausible on its face."

Further, plaintiff cites the language of § 2000e–16(e) as additional proof that Title VII was not intended to exempt individual officers from liability. That subsection provides:

> Nothing contained in this Act shall relieve any government agency or official of its or his primary responsibility to assure non-discrimination in employment as required by the Constitution and statutes ....

Preempting *Bivens* suits against government officials, plaintiff asserts, would reduce the language of subsection (e) to a nullity.

Whether *Brown* preempts *Bivens* suits against government officials acting in their individual capacities has not yet been resolved by the Seventh Circuit. *Gaballah v. Johnson,* 629 F.2d 1191, 1198 n. 9 (7th Cir. 1980). Other courts, however, have confronted this issue, with varying results. *Compare, e.g., Berio v. EEOC,* 446 F.Supp. 171 (D.D.C.1978) *with Neely v. Blumenthal,* 458 F.Supp. 945 (D.D.C.1978). Although

the question is not an easy one, this court finds the analysis in *Neely* most persuasive.

In that case Judge Sirica began by noting that *Brown* was decided on the basis of the sovereign immunity doctrine, "a doctrine that curtails the ability of claimants to obtain official relief *against the federal government* ...." *Neely, supra* at 952. As a consequence, the court reasoned that *Brown's* preemption rules only cuts off *official* remedies for federal employment discrimination, and does not disturb avenues of relief against officials in their individual capacities. *Id.* at 954–55.

> The import of the sovereign immunity element in the *Brown* rationale is not difficult to understand. Sovereign immunity serves to protect the federal government from unconsented suits that go to invading the public treasury and mandating governmental action .... But the doctrine does not extend to protect government officers from personal liabilities arising out of their official activities. Sovereign immunity and the various officer immunities offer separate protections that protect separate interests. Research discloses no case that has held that the two kinds of immunities are integrated in such a way that, if the government consents to suit, parallel remedies against individual officers for the same conduct are of necessity extinguished.
>
> Indeed, just the opposite appears to be the law. The Federal Tort Claims Act, 28 U.S.C. §§ 2671–80 (1970) [FTCA], for example, waives sovereign immunity to make the federal government liable for tortious injuries .... The Act makes clear that the waiver of immunity "provided by this title in such cases shall be exclusive." *Id.* § 2679(a). But this exclusivity does not mean that tort actions covered by the Act and brought against government employees in their personal capacities are cut off simply because the government itself has consented to be liable.

\*    \*    \*    \*    \*    \*

Taking the FTCA as a model, it emerges that waivers of sovereign immunity do not in and of themselves affect preexisting remedies available against individual officials. This is so even though the waivers embody exclusivity principles. Only when the waivers reflect an explicit intent to extinguish parallel remedies is the potential for individual liability diminished.

*Neely, supra* at 952–954.

This conclusion that *Brown* does not bar Langster's ability to proceed against Berman, Forrest and Carothers in their individual capacities [8] is only the first hurdle plaintiff must overcome in his attempt to sustain Counts IV and V. The final question with respect to these counts is whether this court *should* imply a *Bivens* cause of action.[9]

■ In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court, for the first time, inferred a private right of action for damages against federal officers who had violated the plaintiff's Fourth Amendment rights. Judge Sirica in *Neeley v. Blumenthal, supra,* after ruling that *Brown* did not preempt the damage claims against the agency officers, refused to imply a *Bivens* action, noting that plaintiff there could obtain financial redress through Title VII and that the Supreme Court had neither expanded nor amplified on the *Bivens* doctrine. If that is where the matter rested, this court would agree with that conclusion. The substantive relief plaintiff seeks is entirely recoverable under Title VII or the Age Discrimination in Employment Act and, indeed, is sought by invoking the remedial citations of those laws. The claim arises not in the context of a suit by a private person seeking relief as a result of

arbitrary government action but in the context of the federal employment relationship, with all its various procedural safeguards and all the circumstances inherent in efficiently administering the public's business. Two years after *Neely,* however, the Court, in *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), broadened the cause of action established by *Bivens. See Briggs v. Goodwin,* 698 F.2d 486 (D.C.Cir.1983). In permitting the plaintiff to bring a *Bivens* suit for damages against federal officials under the Eighth Amendment, even though there existed an action under the Federal Tort Claims Act [FTCA], the Court in *Carlson* held that a *Bivens* remedy should be implied unless one of the following situations are present:

> The first is when defendants demonstrate "special factors counseling hesitation in the absence of affirmative action by Congress." 403 U.S. at 396 [91 S.Ct. at 2005]; *Davis v. Passman,* 442 U.S. 228, 245 [99 S.Ct. 2264, 2277, 60 L.Ed.2d 846] (1979) The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective. *Bivens, supra,* at 397 [91 S.Ct. at 2005]; *Davis v. Passman,* 442 U.S., at 245–47 [99 S.Ct., at 2277–78].

*Carlson, supra,* 446 U.S. at 18–19, 100 S.Ct. at 1471–1472.

Neither situation was found applicable in *Carlson:*

> First, the case involves no special factors counseling hesitation in the absence of affirmative action by Congress. Petitioners do not enjoy such independent status in our constitutional scheme as to suggest that judicially created remedies against

---

**8.** It should be noted that while this court accepts some of plaintiff's arguments, others are not persuasive. In particular, this court does not read § 2000e–16(e) in the manner plaintiff suggests. Rather than indicating Congress' intent to hold government officials personally liable in a court of law, the subsection merely exhorts all federal employees to act nondiscriminatorily. In other words, the subsection merely describes hoped-for conduct, but does

not establish a basis for liability for violations of that standard.

**9.** The Court in *Neely* ultimately concluded that a *Bivens* action should not be implied. That decision, however, was before the Supreme Court in *Carlson* elaborated upon the test used in determining whether a constitutional claim is appropriate.

them might be inappropriate. *Davis v. Passman, supra* at 246 [99 S.Ct. at 2277]. Moreover, even if requiring them to defend respondent's suit might inhibit their efforts to perform their official duties, the qualified immunity accorded them under *Butz v. Economou,* 438 U.S. 478 [98 S.Ct. 2894, 57 L.Ed.2d 895] (1978) provides adequate protection . . . .

Second, we have here no explicit congressional declaration that persons injured by federal officers' violations of the Eight Amendment may not recover money damages from the agents but must be remitted to another remedy, equally effective in the view of Congress . . . . FTCA was enacted long before *Bivens* was decided, but when Congress amended FTCA in 1974 . . . the Congressional comment accompanying that amendment made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action.

\*   \*   \*   \*   \*   \*

Four additional factors, each suggesting that the *Bivens* remedy is more effective than the FTCA remedy, also support our conclusion that Congress did not intend to limit respondent to an FTCA action. First, the *Bivens* remedy, in addition to compensating victims, serves a deterrent purpose . . . . Because the *Bivens* remedy is recoverable against individuals, it is a more effective deterrent than the FTCA remedy against the United States. It is almost axiomatic that the threat of damages has a deterrent effect . . . surely particularly so when the individual official faces personal financial liability.

\*   \*   \*   \*   \*   \*

Second, our decisions, although not expressly addressing and deciding the question, indicate that punitive damages may be awarded in a *Bivens* suit. Punitive damages . . . are especially appropriate

to redress the violation by a Government official of a citizen's constitutional rights.

\*   \*   \*   \*   \*   \*

Third, a plaintiff cannot opt for a jury in a FTCA action . . . as he may in a *Bivens* suit.[10]

*Carlson v. Green, supra,* 446 U.S. at 19–22, 100 S.Ct. at 1471–1473.

Similarly, in applying the *Carlson* analysis to the instant case, the second situation—when Congress *explicitly* provides for a substitute remedy to *Bivens*—is not present. *Cf. Carlson, supra* 446 U.S. at 14, 100 S.Ct. at 1468, 64 L.Ed.2d at 15 (J. Burger, dissenting) ("the court's test throws into doubt the decision in *Brown v. GSA,* [since] [i]n enacting § 717 Congress did not say the magic words which the court now seems to require"). Further, those factors which led the Court to conclude that the FTCA was an *ineffective* alternative to a suit based on the Constitution—the deterrent effect of personal liability, the inability to award punitive damages and the absence of a jury trial—apply equally to the case at bar. *But cf. Cagan v. United States Postal Service,* No. 81–0032–F (D. Mass. December 13, 1982). Thus, the question is whether there exists "special factors counseling hesitation in the absence of affirmative action by Congress."

Neither the *Bivens* nor the *Carlson* decisions elaborate upon the considerations which justify limiting a *Bivens* cause of action. In both cases, however, the Court indicates concern for preserving the separation of powers between the branches of government. Thus, the Court cautions that acceptance of a *Bivens*-type suit may be inappropriate when there are questions of "federal fiscal policy," *Bivens, supra* 403 U.S. at 395, 91 S.Ct. at 2004, or in cases involving federal employees who enjoy independent status in our constitutional scheme. *Carlson, supra* at 19.[11] Neither of these factors are implicated here.

---

**10.** The fourth factor noted by *Carlson* is not applicable to the instant case.

**11.** The Court in *Carlson* cites *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1978) for the proposition that implication

of a *Bivens* cause of action may be inappropriate in cases involving federal employees who enjoy independent status in our constitutional scheme. In *Davis* a discrimination suit was brought pursuant to the Fifth Amendment

These specific concerns identified in *Carlson* and *Bivens,* however, were merely examples of situations in which caution should be exercised before implying a constitutional remedy. Subsequent lower court decisions have suggested various other "special factors" to be considered when implying a *Bivens* action. Recently the Fifth Circuit found that "the unique relationship between the Federal Government and its civil service employees is a special consideration which counsels hesitation in inferring a *Bivens* remedy in the absence of affirmative congressional action. The role of the Government as an employer toward its employees is fundamentally different from its role as sovereign over private citizens generally." *Bush v. Lucas,* 647 F.2d 573, 576 (5th Cir.1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 3481, 73 L.Ed.2d 1365 (1982).[12] *Accord Broadway v. Block,* 694 F.2d 979 (5th Cir.1982).

The court in *Bush* concluded that a *Bivens* action should not be inferred, and thus dismissed plaintiff's suit against the Director of the Marshall Space Flight Center under the First Amendment for retaliatory demotion.

> This special relationship [between the government and its employees] affects not only the substantive rights of public employees, but also the way in which an aggrieved employee can assert and redress his rights in the employment context. Consistent with the notion that the Government should have wide latitude and control over its employees, Congress, rather than the courts, has traditionally carried the burden of regulating the Government employer-employee relationship ... Congress has sought to achieve a proper balance between promoting governmental efficiency and protecting the

rights of employees aggrieved by improper personnel action. This process of fine tuning has continued with the enactment of the Civil Service Reform Act of 1978 and has been supplemented by detailed administrative regulations.

\*   \*   \*   \*   \*   \*

We stress the remedies made available by Congress to an aggrieved civil servant in order to emphasize the care Congress has taken to carefully balance the employee's rights as a citizen with the Government's interest in the efficient conduct of the nation's business. The very comprehensiveness of the legislative and administrative scheme evinces Congress' awareness of the special relationship and of the Government's responsibilities toward its civil service employees.

The employer-employee context of this case serves to distinguish it from suits such as *Bivens* and *Carlson* which involved plaintiffs as private citizens seeking damages against agents of the Government acting in its sovereign capacity. Inferring a *Bivens* remedy in this case would tend to interfere with and undermine the traditional control of the Government over its internal and personnel affairs. It might encourage aggrieved employees to bypass the statutory and administrative remedies in order to seek direct judicial relief and thereby deprive the Government of the opportunity to work out its personnel problems within the framework it has so painstakingly established. Ultimately, it would provide a disincentive for Congress to continue improving the mechanisms by which an aggrieved employee can protect his rights.

\*   \*   \*   \*   \*   \*

---

against a United States congressman. The Court was concerned about a suit against a legislator for actions taken in the course of his official duties, but held that such concerns are co-extensive with the protections afforded by the Speech or Debate Clause. 442 U.S. at 246, 99 S.Ct. at 2277.

**12.** The initial Fifth Circuit opinion in *Bush* was remanded by the Supreme Court for reconsid-

eration in light of *Carlson,* but the Court of Appeals found no reason to alter its prior decision in which it held that plaintiff had no cause of action under the First Amendment. Certiorari has been granted on this "second" decision in *Bush,* and arguments have been heard before the Supreme Court. This opinion, of course, is subject to reconsideration should the Court reverse or modify the Fifth Circuit's decision.

While the result in the case might be different if failure to recognize a *Bivens* remedy would leave Bush, as the Congressional employee in *Davis v. Passman,* without any remedy, this of course is not the case. We therefore find, consistent with *Carlson v. Green* that the Government employer-employee relationship present in this case is a special factor which counsels hesitation in recognizing a constitutional cause of action in the absence of affirmative action by Congress.[13]

*Bush v. Lucas, supra* at 576–77.

The reasoning in *Bush* was followed by Judge Decker in *Gillam v. Roudebush,* 547 F.Supp. 28 (N.D.Ill.1982). In that case the court dismissed plaintiff's First Amendment claim against his federal employers, stressing the unique relationship between the government and its workers, as well as the existence of an adequate administrative remedy. *Id.* at 31–32.

The absence of a *Bivens* remedy ill serves the deterrent question referred to in *Carlson.* It also forecloses an employee from obtaining a jury or seeking punitive damages. The issue remains an active one in the courts and it has expressly been left open by the Supreme Court. *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 2740 at fn. 36, 73 L.Ed.2d 396 (1982). This court is not, however, unmindful of the reluctance of the courts to permit such actions, whether resting on preemption or the refusal to imply a *Bivens* remedy. This court, as well, concludes that the federal employment relationship does counsel hesitation, particularly when a plaintiff has both a developed administrative remedy and, thereafter, a developed judicial remedy independent of the administrative process, both of which are capable of providing him most, if not all, of the relief he seeks.

For the reasons stated, the motion to strike the allegations of racial discrimination is denied, the motion to dismiss the

individual defendants and to strike the prayer for punitive damages and jury demand from Count V is granted, and the parallel motion with respect to Count IV is denied.

---

**13.** The "different case" referred to in *Bush* finds expression in *Sonntag v. Cooley, supra,* where the claim arose in the context of the federal employment relationship but where plaintiff had no statutory (or even administrative) remedy for her claimed forced resignation.

Defendants have not, it should be noted, argued that such remedies exist here for the First Amendment claims arising from union representation activities *not within* Title VII (Count IV).