759 F.2d 1353
 2 Fed.R.Serv.3d 23, 15 Envtl. L. Rep. 20,813
 UNITED STATES of America, Plaintiff-Appellee,
and
Quileute, Makah, Lummi, Muckleshoot, Squaxin Island,
Skokomish, Lower Elwha, Snoqualmie, Duwamish, Stillaguamish,
Sauk-Suiattle, Nisqually, Swinomish, Tulalip, Puyallup,
Quinault, Upper Skagit, Yakima, Nooksack, Steilacoom,
Samish, Snohomish, and Port Gamble Band of Clallam Indian
Tribes, Plaintiff-Intervenors-Appellees,
v.
STATE OF WASHINGTON, Defendant-Appellant,
and
State of Washington Department of Fisheries and State of
Washington Department of Game, Defendant-Intervenors.
 No. 81-3111.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted En Banc
Oct. 12, 1983.
Decided April 29, 1985.
 
 Anne S. Almy, Dept. of Justice, Washington, D.C., for plaintiff-appellee.
 Alam C. Stay, Evergreen Legal Service, Seattle, Wash., for Quileute and Nisqually Tribes.
 Edward B. Mackie, Deputy Atty. Gen., Olympia, Wash., for defendant-appellant.
 Appeal from the United States District Court for the Western District of Washington.
 Before BROWNING, SNEED, KENNEDY, ANDERSON, SKOPIL, SCHROEDER, ALARCON, POOLE, FERGUSON, NELSON, and NORRIS, Circuit Judges.
 PER CURIAM:
 
 
 1
 The State's petition for rehearing is granted and our opinion of December 17, 1984 is withdrawn. The opinion of the panel which first heard the case is vacated. See United States v. Washington, 694 F.2d 1374 (9th Cir.1983). The following constitutes the opinion of the court.
 
 
 2
 The State of Washington appeals from the district court's grant of declaratory judgment in the second phase of this protracted litigation over Indian Treaty fishing rights in the Pacific Northwest. The trial court granted the declaratory relief sought by the United States on behalf of the treaty Indians. The Tribes named in the caption joined as intervenors. The district court characterized its disposition as "but the most recent link in a long chain of opinions construing the following twenty-seven words:
 
 
 3
 'The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory ....' "
 
 
 4
 United States v. Washington, 506 F.Supp. 187, 189 (W.D.Wash.1980).
 
 
 5
 The district court granted a declaratory judgment with respect to two issues, which it designated as the hatchery fish issue and the environmental issue. To resolve the hatchery fish issue, the court declared that hatchery fish are included in the fish to be apportioned by the treaty. To resolve the environmental issue, the court declared that the right to take fish necessarily includes the right to have those fish protected from man-made despoliation, so that the treaties impose upon the State a corresponding duty to refrain from degrading or authorizing the degradation of the fish habitat to an extent that would deprive the treaty Indians of their moderate living needs. We affirm the district court's declaratory judgment on the hatchery fish issue. We hold that declaratory relief on the environmental issues must be denied and vacate that part of the judgment of the district court.
 
 
 6
 A century-old conflict over fishing rights between the Indians and the State prompted the United States in 1970 to begin litigation on its own behalf and as trustee of interested Indian tribes. The suit was bifurcated for trial into separate parts or phases. United States v. Washington, 384 F.Supp. 312, 327-28 (W.D.Wash.1974) (Boldt, J.), aff'd, 520 F.2d 676 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); United States v. Washington, 459 F.Supp. 1020 (W.D.Wash.1974-1978), various appeals dismissed, 573 F.2d 1117, 1118, 1121 (9th Cir.1978), decisions at 459 F.Supp. 1020, 1097-118 (W.D.Wash.1977-1978), aff'd sub nom. Puget Sound Gillnetters Association v. United States District Court, 573 F.2d 1123 (9th Cir.1978), aff'd in part, vacated in part, and remanded sub nom. Washington v. Washington State Commercial Passenger Fishing Vessel Association, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) ("Fishing Vessel ").
 
 
 7
 District Judge Boldt's 1974 decision determined that the fishing clause appearing in six treaties negotiated by Governor Issac Stevens between the United States and several Pacific Northwest Indian tribes in 1854 and 1855 entitles the Tribes to a specific allocation of the salmon and steelhead trout in the treaty area. The treaties bind the State of Washington under the Supremacy Clause, U.S. Const. art. VI, cl. 2, which imposes upon the states the obligation to observe and carry out the provisions of treaties of the United States. 506 F.Supp. at 189 n. 2, 206; United States v. Washington, 384 F.Supp. 312, 401 (W.D.Wash.1974). The geographical region affected by the treaties comprises the State of Washington west of the Cascade Mountains and north of the Columbia River drainage area, including the American portion of the Puget Sound watershed, the watersheds of the Olympic Peninsula north of the Grays Harbor watershed, and the offshore waters adjacent to those areas.
 
 
 8
 The Supreme Court affirmed. It held that "[b]oth sides have a right, secured by treaty, to take a fair share of the available fish.... [A]n equitable measure of the common right should initially divide the harvestable portion of each run that passes through a 'usual and accustomed place' into approximately equal treaty and nontreaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount." Fishing Vessel, 443 U.S. at 684-85, 99 S.Ct. at 3073-74.
 
 
 9
 The United States, and the Tribes as intervenors, initiated Phase II in 1976 by filing amended and supplemental complaints. The complaints requested a declaration that artificially propagated hatchery fish are included in the allocable fish population, a declaration that the right to take fish incorporates the right to have treaty fish protected from man-made despoliation, and such further relief as the court deemed necessary to safeguard the rights declared. This phase of the litigation in district court ended with the court's grant of declaratory relief on the hatchery fish and the environmental issues. The State appeals.
 
 
 10
 We consider first whether the orders of the district court are final and appealable. The district court's grant of declaratory relief followed months of procedural maneuvering by the parties. In July 1978, the Tribes filed with the district court a "Statement of Declaratory and Injunctive Relief." In November 1978, the plaintiffs filed a summary judgment motion seeking a declaratory judgment that the treaty reserves to the Tribes a right to protection against the State's "adverse environmental actions or inactions." In January 1980, the plaintiffs moved for partial summary judgment on the hatchery fish issue, seeking a declaration that "hatchery fish are included within the 'treaty right of taking fish.' "
 
 
 11
 The district court granted the motions and directed the parties to file a proposed order consistent with the factual findings and legal conclusions stated in its opinion. 506 F.Supp. at 208. The Tribes filed a proposed declaratory judgment, citing to 28 U.S.C. Sec. 2201, on both the environmental and hatchery fish issues. The proposed order by its terms excluded from its scope any "issue of whether the state has violated the treaty tribes' right to have the ... environment protected" and "what remedies, if any, plaintiffs are entitled to." The proposed order stated that it "constitutes a final Declaratory Judgment and is reviewable as such."
 
 
 12
 The district court entered an "Amended Judgment" in January 1981, noting its jurisdiction "pursuant to 28 U.S.C. Secs. 1331, 1343(3) and (4), 1345, and 1362, to enter a declaratory judgment pursuant to 28 U.S.C. Sec. 2201." The court's judgment adopted the language of the Tribes' proposed order regarding the scope of the judgment, and reiterated that the "Amended Judgment constitutes a final declaratory judgment and shall be reviewable as such."
 
 
 13
 The district court's judgment completely resolved the Tribes' claims in Phase II of the action. The plaintiffs were granted the only relief they sought, declaratory judgment on the environmental and hatchery fish issues. We therefore have jurisdiction under 28 U.S.C. Sec. 1291 to review the district court's grant of declaratory judgment pursuant to 28 U.S.C. Sec. 2201. See United States v. Adair, 723 F.2d 1394, 1397 (9th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984); Laguna Hermosa Corp. v. Martin, 643 F.2d 1376, 1978 (9th Cir.1981).
 
 
 14
 The Declaratory Judgment Act does not grant litigants an absolute right to a legal determination. Zemel v. Rusk, 381 U.S. 1, 19, 85 S.Ct. 1271, 1282, 14 L.Ed.2d 179 (1965); Public Service Commission v. Wycoff Co., 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952); 28 U.S.C. Sec. 2201 (1982). The decision to grant declaratory relief is a matter of discretion, A.L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 331, 82 S.Ct. 337, 342, 7 L.Ed.2d 317 (1961); Cheesebrough-Ponds, Inc. v. Faberge, Inc., 666 F.2d 393, 396 (9th Cir.), cert. denied, 459 U.S. 967, 103 S.Ct. 294, 74 L.Ed.2d 277 (1982), even when the court is presented with a justiciable controversy. International Harvester Co. v. Deere & Co., 623 F.2d 1207, 1217 (7th Cir.1980); Muller v. Olin Mathieson Chemical Corp., 404 F.2d 501, 505 (2d Cir.1968). In fact, the court may, after a full consideration of the merits, exercise its discretion to refuse to grant declaratory relief because the state of the record is inadequate to support the extent of relief sought. National Automatic Laundry & Cleaning Council v. Schultz, 443 F.2d 689, 703 (D.C.Cir.1971).
 
 
 15
 The customary deference for the district court is not applicable to its determination to grant a declaratory judgment. The court of appeals must exercise its own sound discretion to determine the propriety of the district court's grant or denial of declaratory relief. Bilbrey By Bilbrey v. Brown, 738 F.2d 1462, 1470 (9th Cir.1984); Doe v. Gallinot, 657 F.2d 1017, 1025 (9th Cir.1981); International Harvester Co. v. Deere & Co., 623 F.2d 1207, 1217 (7th Cir.1980); Delno v. Market Street Ry. Co., 124 F.2d 965, 967-68 (9th Cir.1942); E. Borchard, Declaratory Judgments 293-94 (1941).
 
 
 16
 In determining whether the decision to grant declaratory relief is proper, we consider both the circumstances of the parties and the sound jurisprudence of the court. Declaratory relief should be denied when prudential considerations counsel against its use, Moore v. U.S. House of Representatives, 733 F.2d 946, 955 (D.C.Cir.1984), and the decision to grant declaratory relief should always be made with reference to the public interest. Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed.2d 604 (1962) (per curiam); Eccles v. Peoples Bank, 333 U.S. 426, 431, 68 S.Ct. 641, 644, 92 L.Ed. 784 (1948); National Automatic Laundry & Cleaning Council, 443 F.2d at 703. Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties. Winpisinger v. Watson, 628 F.2d 133, 141 (D.C.Cir.1980) (per curiam); McGraw-Edison Co. v. Preformed Line Products Co., 362 F.2d 339, 342-43 (9th Cir.) (quoting Yellow Cab Co. v. City of Chicago, 186 F.2d 946, 950-51 (7th Cir.1951)), cert. denied, 385 U.S. 919, 87 S.Ct. 229, 17 L.Ed.2d 143 (1966); 10A C. Wright, A. Miller, M. Kane, Federal Practice and Procedure Sec. 2759 (2d ed. 1983) (quoting Borchard, Declaratory Judgments 299 (2d ed. 1941)).
 
 
 17
 The limitations upon issuance of a declaratory judgment, expressed as a doctrine of judicial discretion, reflect concerns similar to those underlying the case and controversy limitation of Article III, United Public Workers v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947); Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 240-41, 57 S.Ct. 461, 463-64, 81 L.Ed. 617 (1937), though the principles of sound discretion are more comprehensive and are subject to more flexible elaboration by the court. We choose to rest our decision in this case on the proposition that issuance of the declaratory judgment on the environmental issue is contrary to the exercise of sound judicial discretion. The legal standards that will govern the State's precise obligations and duties under the treaty with respect to the myriad State actions that may affect the environment of the treaty area will depend for their definition and articulation upon concrete facts which underlie a dispute in a particular case. Legal rules of general applicability are announced when their consequences are known and understood in the case before the court, not when the subject parties and the court giving judgment are left to guess at their meaning. It serves neither the needs of the parties, nor the jurisprudence of the court, nor the the interests of the public for the judiciary to employ the declaratory judgment procedure to announce legal rules imprecise in definition and uncertain in dimension. Precise resolution, not general admonition, is the function of declaratory relief. These necessary predicates for a declaratory judgment have not been met with respect to the environmental issue in this case.
 
 
 18
 The State of Washington is bound by the treaty. If the State acts for the primary purpose or object of affecting or regulating the fish supply or catch in noncompliance with the treaty as interpreted by past decisions, it will be subject to immediate correction and remedial action by the courts. In other instances, the measure of the State's obligation will depend for its precise legal formulation on all of the facts presented by a particular dispute. The trial court is instructed to vacate its judgment with reference to the environmental aspect of the case.
 
 
 19
 The declaratory judgment resolving the separate issue relating to hatchery fish does not suffer from similar infirmities. In this context, the state of the record provides a sufficient basis upon which the court may exercise its discretion. Further, a declaratory judgment on the issue clarifies and settles the legal relations of the parties and affords relief from a precise dispute identified in the proceedings.
 
 
 20
 We consider the merits of the declaratory judgment with respect to the hatchery fish issue. In reaching its decision, the district court correctly assigned special importance to canons for interpretation of Indian treaties. These canons call for promoting the treaties' central purposes; construing treaties as they were originally understood by the tribal representatives, rather than according to legal technicalities; resolving ambiguities in favor of the Indians; and interpreting the treaties in the Indians' favor. 506 F.Supp. at 195 (quoting Fishing Vessel, 443 U.S. at 676, 99 S.Ct. at 3069); see Jones v. Meehan, 175 U.S. 1, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49 (1899); Tulee v. Washington, 315 U.S. 681, 684-85, 62 S.Ct. 862, 864, 86 L.Ed. 1113 (1942); Seufert Brothers Co. v. United States, 249 U.S. 194, 198, 39 S.Ct. 203, 205, 63 L.Ed. 555 (1919); United States v. Winans, 198 U.S. 371, 380-81, 25 S.Ct. 662, 663-64, 49 L.Ed. 1089 (1905).
 
 
 21
 Before the district court, the State argued that the first generation of hatchery-produced fish should be excluded from the allocation. It conceded that subsequent generations, which spend their entire life cycle in the natural environment, constitute part of the allocable population. The district court rejected this position, holding that all hatchery fish must be included in the computation of shares "in order to effectuate the parties' intent and the purposes of the fishing clause." 506 F.Supp. at 197.
 
 
 22
 The district court based its decision upon several factors: (1) its interpretation of Fishing Vessel; (2) its inability to discern any recognized limitation on the Indian right to take fish on the basis of fish species or origin; (3) the role that non-Indian commercial fishing and non-Indian degradation of the fish habitat played in causing the natural fishery's decline; (4) the original purpose of the State hatchery program to replace natural fish that were lost due to man-made causes; and (5) the practical effect of excluding an ever-increasing proportion of the case fish population from the treaty allocation area. 506 F.Supp. at 197-99. Thus, the district court held that hatchery fish constitute fish within the meaning of the treaty regardless of whether they originate in state, Indian, or federal hatcheries, or from cooperative ventures. 506 F.Supp. at 202.
 
 
 23
 On appeal, the State argues that the district court erred in relying on Fishing Vessel to find that hatchery fish are subject to treaty allocation, and that equity protects the State from having to share with the Indians its hatchery contribution. We disagree.
 
 
 24
 Although Fishing Vessel does not mandate the result reached by the district court, it does strongly support it, as do the other grounds relied upon by the district court. The district court determined that Fishing Vessel 's reaffirmation of the view that the treaties were designed to guarantee the Tribes an "adequate supply of fish" went "far toward resolving the hatchery issue" in the Tribe's favor. 506 F.Supp. at 197.
 
 
 25
 In Fishing Vessel the Court specifically disclaimed any intention of deciding conclusively the hatchery fish issue. 443 U.S. at 688 n. 30, 99 S.Ct. at 3076 n. 30. Interpreting the treaty in favor of the Indians, the Court held that because they gave up something of great value, their land, it must be presumed that they obtained significantly valuable rights in return. But because the Indians obtained something of value, it does not necessarily follow that they received everything of value pertaining to "taking fish, at all usual and accustomed grounds...."
 
 
 26
 However, the district court properly concluded that Fishing Vessel 's holding that the Tribes are entitled under the treaty to an "adequate supply of fish" supports the inclusion of hatchery fish in the allocation. 506 F.Supp. at 197. Contrary to certain statements in the district court's opinion, the Supreme Court in Fishing Vessel did not hold that the Tribes were entitled to any particular minimum allocation of fish. Instead, Fishing Vessel mandates an allocation of 50 percent of the fish to the Indians, subject to downward revision if moderate living needs can be met with less. The Tribes have a right to at most one-half of the harvestable fish in the case area. This limitation on the amount of fish allocable to the Tribes highlights the need to permit them to share equitably in the hatchery fish.
 
 
 27
 In short, while we agree with the State that Fishing Vessel is not entirely determinative of the hatchery fish issue, we believe that some degree of reliance on that case is well-founded. The Indians are entitled to participate equitably in the increased supply of fish even if made possible solely through the efforts of the State.
 
 
 28
 Contrary to the State's assertions on appeal, we find that equitable considerations in this case support the Indians' position. Four factors favor affirmance of the district court's declaratory judgment on this issue: (1) the lack of State ownership of the fish once released; (2) the lack of any unjust enrichment of the Tribes; (3) the fact that hatchery fish and natural fish are not distinguished for other purposes; and (4) the mitigating function of the hatchery fish programs.
 
 
 29
 The Supreme Court has rejected the notion that a state owns fish swimming within its waters. Douglas v. Seacoast Productions, Inc., 431 U.S. 265, 284, 97 S.Ct. 1740, 1751, 52 L.Ed.2d 304 (1977). The State does not seriously contest the issue of ownership, but argues by analogy to the developed waters doctrine that it has greater regulatory authority over hatchery fish than over natural fish. In its formulation most helpful to the State, the developed waters doctrine would be that one who by his own efforts develops water not otherwise available for use has a superior right to the use of those waters, even in times of drought where other appropriators have prior rights in the water system. J. Sax, Water Law, Planning and Policy 492 (1968) (citing cases). Indian treaty rights, however, are not necessarily determined by analogy to water appropriation cases, which involve conflicts between private parties or between the State and a private party. In those cases, the critical factor of special protection for the Indian is absent. When the State relinquishes control over the fish by releasing them to public waters, they may not be excluded from the treaty allocation.
 
 
 30
 The State argues it has financed the hatchery construction and the Tribes are unjustly enriched if given a share of hatchery fish. The contention is unconvincing. Fund for State hatcheries is derived not only from the State, but also from the tribes, the federal government, and private sources. 506 F.Supp. at 196-97 nn. 31 & 32. More importantly, to allow the source of funding to determine rights would permit the State to buy out treaty fishing rights, not by paying the Tribes, but rather by paying for the replacement of treaty-protected fish with unprotected fish. 506 F.Supp. at 200-01. That which is prohibited directly may not be accomplished by other means.
 
 
 31
 From 1895 to 1973, the State and its laws and policies made no distinction between hatchery and natural fish. Yet the State urges that distinction now. Biologically, hatchery fish and natural fish are virtually indistinguishable. Even assuming the technological feasibility to distinguish between these fish, we do not accept the distinction as a means for undermining treaty rights. Hatchery fish are included within a host of federal programs. See, e.g., Anadromous Fish Conservation Act, 16 U.S.C. Sec. 757a(c) (1982). The term fish in other legal contexts has been held to include lobsters, State v. Hardy, 104 N.H. 310, 185 A.2d 258 (1962), and mussels. Gratz v. McKee, 258 F. 335, 338 (8th Cir.1919). The unavoidable intermingling of natural fish and hatchery fish is in the Tribe's favor when the equities of this case are considered.
 
 
 32
 The hatchery programs have served a mitigating function since their inception in 1895. 506 F.Supp. at 198. They are designed essentially to replace natural fish lost to non-Indian degradation of the habitat and commercialization of the fishing industry. Id. Under these circumstances, it is only just to consider such replacement fish as subject to treaty allocation. For the Tribes to bear the full burden of the decline caused by their non-Indian neighbors without sharing the replacement achieved through the hatcheries, would be an inequity and inconsistent with the Treaty.
 
 
 33
 That portion of the district court's judgment granting a declaratory judgment with regard to the hatchery fish issue is AFFIRMED. The declaratory relief granted with regard to the environmental issue is VACATED.
 
 
 34
 SNEED, Circuit Judge, with whom J. BLAINE ANDERSON, Circuit Judge joins, concurring:
 
 
 35
 I join in the per curiam opinion. In doing so I do not wish to be understood as retreating from the position taken by the panel which initially heard this case. There comes a time, however, in a collegial body in which it is better to reach an agreement that is tolerable by a majority than it is to adhere to one's preferred position. This is such a time.
 
 
 36
 FERGUSON, Circuit Judge, with whom SCHROEDER, Circuit Judge, joins, concurring:
 
 
 37
 I concur in the majority opinion. In addition to the reasons set forth in the opinion, I would vacate that portion of the district court's judgment which pertains to the environmental degradation issue because of the absence of a case or controversy in the present posture of the litigation.
 
 
 38
 While it is true that the complaint and amendments filed in this case present a case or controversy, the motion for a summary judgment on the environmental degradation issue does not and the judgment of the district court based on that motion is only an advisory opinion.
 
 
 39
 It is axiomatic that federal courts will not announce opinions unless concrete issues in actual cases are in question. United Public Workers v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). The United States Constitution, art. III, Sec. 2, cl. 1, limits the judicial power of the federal courts to resolving cases or controversies. The Supreme Court has held:
 
 
 40
 A justiciable controversy is ... distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot.... The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.... It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.
 
 
 41
 Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 240-41, 57 S.Ct. 461, 463-64, 81 L.Ed. 617 (1937) (citations omitted). The requirement of a "case" or "controversy" in order to sustain federal jurisdiction is no less strict under the Declaratory Judgment Act, 28 U.S.C. Sec. 2201, than in other suits. Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 1117, 87 L.Ed. 1450 (1943).
 
 
 42
 Although the plaintiffs originally made a specific request to enjoin at least eight separate State activities--claims that would have presented a justiciable controversy--both the question of whether these State activities had violated the Tribes' alleged environmental rights, and, if so, what remedies were appropriate, were excluded from the scope of the plaintiffs' motion before the district court. See United States v. Washington, 506 F.Supp. 187, 194, 203 (W.D.Wash.1980). See also Defendant's Statement Re Issues for Pre-Trial Resolution ("Plaintiffs believe that [the environmental issue] is a pure question of law and no factual material is relevant or required."). The court thus decided the scope of treaty rights as a pure issue of law divorced from any factual context. United States v. Washington, 506 F.Supp. at 202 ("[T]he only aspect of [the environmental] issue presently before the Court is the legal question whether the tribes' fishing right includes the right to have treaty fish protected from environmental degradation.").
 
 
 43
 In reaching its decision, the district court, therefore considered only the pertinent wording of the treaty, Washington, 506 F.Supp. at 189, and a stipulation entered into between the parties, which it termed the "Joint Biology Statement." Id. at 203 & n. 58. In this Joint Biology Statement, the parties agreed that many factors contributed to the decline of salmon in the State of Washington. These factors resulted primarily from the urbanization and intensive settlement of the area. 506 F.Supp. at 203. The State has conceded only that human activities have contributed to environmental degradation, not that the State's activities have caused the degradation. Indeed, the State asserts it is not at fault for whatever environmental degradation has occurred. It is, however, the affirmative link between the harm alleged by the plaintiffs and the conduct of the defendant which forms the basis for a justiciable controversy. See O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974).
 
 
 44
 Thus, general "degradation" of the environment or a threat of possible "despoliation" of the fishing habitat without any showing of activities by the State which caused or would cause such degradation so as to interfere with the Tribes' treaty rights does not make a justiciable case or controversy. As stated by the Supreme Court in United States v. West Virginia, 295 U.S. 463, 474, 55 S.Ct. 789, 793, 79 L.Ed. 1546 (1935):
 
 
 45
 Until the right asserted is threatened with invasion by acts of the State, which serve both to define the controversy and to establish its existence in the judicial sense, there is no question presented which is justiciable by a federal court.
 
 
 46
 Because the plaintiffs' motion for partial summary judgment considered by the district court did not reach the questions of whether the State was violating the Tribes' alleged environmental right and, if so, what relief would be warranted, the environmental issue presented to the district court was "too vague and ill-defined to admit of judicial determination." United States v. West Virginia, 295 U.S. at 474, 55 S.Ct. at 793. Judicial power to declare the rights of individuals " 'is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy.' " Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting Chicago & Grand Trunk Railway v. Wellman, 143 U.S. 339, 345, 12 S.Ct. 400, 402, 36 L.Ed. 176 (1892)). See also Longshoremen's Union v. Boyd, 347 U.S. 222, 224, 74 S.Ct. 447, 448, 98 L.Ed. 650 (1954) ("Determination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function.").
 
 
 47
 Furthermore, as pointed out by the majority, the judgment of the district court provides no guidance for the parties involved and consequently serves no useful purpose. See Public Service Commission v. Wycoff Co., 344 U.S. 237, 244, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952) (An Article III controversy must "not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them."). The district court found that the treaty placed a duty on the State "to refrain from degrading the fish habitat to an extent that would deprive the tribes of their moderate living needs." 506 F.Supp. at 208. Because this case was decided in a posture divorced from any factual context, it is impossible to perceive what is meant by "degrading the fish habitat," or "moderate living needs." What, for instance, constitutes degradation of the fish habitat? Hospital construction? School construction? Issuance of permits for residential developments? Licensing logging operations? What burden of proof must be met? Must the State show lack of intent? Lack of negligence? Lack of scienter? Lack of causation?
 
 
 48
 Thus, declaratory relief on the environmental issue, divorced from any consideration of specific State activities, affords no relief from the uncertainty giving rise to the proceeding and merely provides a beautiful but hollow statement of principle. The State is no wiser about what it can or cannot do than it was before the decision was rendered. In effect, rather than clarifying and settling the legal relations in the issue, the judgment essentially puts the State into receivership--it cannot authorize any construction or development without first seeking a determination in the district court as to whether such construction or development constitutes a prohibited act of "environmental degradation."
 
 
 49
 Because the issues of causation, liability and remedies were excluded from the district court's determination, and were instead reserved at that time for a later trial, no concrete case or controversy was presented to the district court. The district court thus lacked jurisdiction to render a declaratory judgment with respect to the environmental issue. See Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 1117, 87 L.Ed. 1450 (1943).
 
 
 50
 NELSON, Circuit Judge, with whom SKOPIL, Circuit Judge, joins, concurring in part and dissenting in part:
 
 
 51
 I concur in the majority's affirmance of the district court's declaration that hatchery fish are "fish" within the meaning of the treaty clause. However, I must respectfully disagree with the majority's statement of the proper standard of review for the district court's use of the mechanism of declaratory relief. I also believe that under any standard of review, the district court's declaratory judgment on the environmental issue should be affirmed.
 
 STANDARD OF REVIEW
 
 52
 The majority adopts what is essentially a de novo standard of review over the district court's discretionary decision to grant declaratory relief. It states that while "[t]he decision to grant declaratory relief is a matter of discretion, ... [t]he court of appeals must exercise its own sound discretion to determine the propriety of the district court's grant or denial of declaratory relief." Majority op. at 1356-1357 (emphasis added). This formulation of the standard of review, while it finds some support in the case law, is troubling. To substitute our discretion for that of the trial court fails to give district courts the deference they deserve over the management of litigation.
 
 
 53
 I believe strongly that the trial court's decision to utilize the mechanism of declaratory relief is essentially a case-management decision that is properly within the trial court's discretion and subject to review only for an abuse of that discretion. I also believe that review over the declaration itself, i.e., the merits of the judgment, must be de novo where, as here, it involves a purely legal question. This view finds support in language from the Supreme Court, see A.L. Mechling Barge Lines, Inc., v. United States, 368 U.S. 324, 331, 82 S.Ct. 337, 341, 7 L.Ed.2d 317 (1961) ("Declaratory judgment is a remedy committed to judicial discretion.") and Kerotest Manufacturing Co. v. C-O-Two Co., 342 U.S. 180, 185, 72 S.Ct. 219, 222, 96 L.Ed. 200 (1952) (stating that "an ample degree of discretion, appropriate for disciplined and experienced judges, must be left to the lower courts"), from within our Circuit, see McGraw-Edison Co. v. Preformed Line Products Co., 362 F.2d 339, 342, 344 (9th Cir.) (stating that employing declaratory relief is within the trial court's sound discretion, and quoting Kerotest ), cert. denied, 385 U.S. 919, 87 S.Ct. 229, 17 L.Ed.2d 143 (1966), and from outside of it, see Exxon Corp. v. F.T.C., 588 F.2d 895, 900 (3d Cir.1978) (decision to grant or deny declaratory relief reviewed for an abuse of discretion).
 
 
 54
 Many cases which have appeared to reject the abuse of discretion standard for the trial court's grant or denial of declaratory relief may have done so because the panels were uncomfortable giving deference to the merits of the declaration; that is, they may have believed that both (1) the propriety of employing the mechanism of declaratory relief, and (2) the declaration itself, had to be reviewed under a single standard. Such deference to the latter, of course, seems inappropriate when we are just as well equipped as the trial court to analyze, for example, a treaty clause. In part, such concerns may explain the "broadening" in this Circuit of the abuse of discretion standard in the context of declaratory relief. See, e.g., Bilbrey by Bilbrey v. Brown, 738 F.2d 1462, 1470 (9th Cir.1984) (giving "more searching review" to exercise of trial court's discretion); Doe v. Gallinot, 657 F.2d 1017, 1025 (9th Cir.1981) (same). I regret that this en banc panel has not taken the opportunity to reexamine this issue, especially since the vast difference between an abuse of discretion standard and a de novo standard may well prove determinative of the outcome of many appeals.
 
 THE ENVIRONMENTAL ISSUE
 
 55
 Once the proper standard of review is applied, both the district court's use of declaratory relief and the merits of its declaration on the environmental issue are entitled to affirmance. Indeed, I would affirm even if a de novo standard were applied to the court's use of declaratory relief.
 
 
 56
 I. Use of the Mechanism of Declaratory Relief
 
 A. Introduction
 
 57
 Under the Declaratory Judgment Act,
 
 
 58
 any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
 
 
 59
 28 U.S.C. Sec. 2201. Before granting declaratory relief, the court must ask first whether an "actual controversy" exists. This requirement, embodied in the Declaratory Judgment Act, is identical to the "case or controversy" requirement of Article III of the U.S. Constitution. Societe de Conditionnement en Aluminium v. Hunter Engineering Co., 655 F.2d 938, 942 (9th Cir.1981). Next, the court should ask (1) whether the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) whether it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. McGraw-Edison, 362 F.2d at 342 (quoting Borchard, Declaratory Judgments 299 (2d Ed.1941)); accord, President v. Vance, 627 F.2d 353, 364 n. 76 (D.C.Cir.1980). "It follows that when neither of these results can be accomplished, the court should decline to render the declaration prayed." McGraw-Edison at id. Here, all necessary conditions are present, making the district court's use of declaratory relief entirely proper. That the declaration may not resolve every aspect of the continuing dispute between the parties does not alter this conclusion.
 
 B. Actual controversy requirement
 
 60
 The Supreme Court has outlined the test for determining whether a suit seeking a declaratory judgment is an actual controversy:
 
 
 61
 The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.
 
 
 62
 Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Here, the issues resolved by the district court's declaratory judgment have been in dispute throughout the litigation. There is a dispute both immediate and real between the treaty fishermen and the State over the scope of their environmental rights and duties under the treaty. The Tribes have alleged all along that actions by the State have adversely affected the fish habitat. The parties asked the district court to define their rights and duties, and to allocate burdens of proof should further litigation ensue. These are more than abstract questions fashioned by the curious to provide work for this court; they spring from sharply conflicting contentions. In short, this case presents an "actual controversy."
 
 
 63
 C. Clarification of legal relations and relief from uncertainty
 
 
 64
 A declaratory judgment resolving the environmental issue would also accomplish the goals of clarifying and settling the legal relations in issue and of affording relief from the uncertainty giving rise to the proceeding. Declaratory relief on the environmental issue would resolve a complex and long-lasting dispute over critical aspects of the parties' rights and responsibilities under the treaty. It would enable the parties to know whether, and the extent to which, the fishery must be protected from environmental degradation. The State needs to know whether this right exists in order to make intelligent decisions about future development in the treaty area. The same is true with respect to the United States, which because of its role as plaintiff trustee in this case, has not been able to represent that interest. If the right does exist to some extent, the State and the United States must take it into account in their development decisions. Likewise, the treaty fishermen need to know where they stand after the Supreme Court's decision in Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) ("Fishing Vessel "). They are entitled to an answer concerning the treaty their forebears accepted.
 
 
 65
 D. Inability of declaratory relief to foreclose all future disputes
 
 
 66
 A declaratory judgment on the environmental issue very likely would not resolve all of the questions concerning the scope of the parties' treaty rights and duties. That could be approached only if the judgment held that the treaty fishermen had no right to have the fishery protected and that the State had no duty to refrain from degradation. A judgment more responsive to the treaty fishermen's needs, by contrast, makes future litigation more than a remote possibility. For example, they may argue in a future case that the State has acted to degrade the fishery in violation of the treaty.
 
 
 67
 The inability of a declaratory judgment to foreclose all future disputes does not render the remedy inappropriate because "uncertain in dimension," maj. op. at 1357. A declaratory judgment need not resolve all the issues in controversy, as long as it resolves a significant disputed issue. Harris v. United States Fidelity & Guaranty Co., 569 F.2d 850, 852 (5th Cir.1978); E. Borchard, supra, at 298; J. Moore, 6A Moore's Federal Practice Sec. 57.08, at 57-46 to 57-47 (1983). The Declaratory Judgment Act explicitly recognizes this possibility when it authorizes the use of a declaratory judgment "whether or not further relief is or could be sought." 28 U.S.C. Sec. 2201. Indeed, in most declaratory judgment actions, as in this case, the declaratory judgment would terminate or sharply reduce the possibility of further litigation only if it were decided in favor of one party, but would leave certain issues unresolved were the opposite result reached.
 
 
 68
 Further, declaratory judgments may appropriately resolve only the existence of certain rights (e.g., the right to have the fishery protected from environmental degradation) claimed by the plaintiffs. See, e.g., United States v. Adair, 723 F.2d 1394 (9th Cir.) (dispute over water rights), cert. denied, --- U.S. ----, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984); Kimball v. Callahan, 493 F.2d 564 (9th Cir.) (dispute over Indians' right to hunt, fish and trap on ancestral reservation without state regulation), cert. denied, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974); Crain v. First National Bank, 324 F.2d 532 (9th Cir.1963) (dispute over applicability of Klamath Termination Act's private trust provisions); Maison v. Confederated Tribes, 314 F.2d 169 (9th Cir.) (dispute over Indians' right to fish without state regulation under treaties involved in instant case), cert. denied, 375 U.S. 829, 84 S.Ct. 73, 11 L.Ed.2d 60 (1963).
 
 E. Conclusion
 
 69
 In short, a declaratory judgment resolving the environmental issue would advance the interests of all the parties in this case. While it may be unable to resolve all potential disputes between the parties, declaratory relief would clarify and settle the legal relations in issue and would afford substantial relief from the uncertainty the parties face. The district court thus acted properly in invoking, at the moving party's request, the mechanism of declaratory relief on the environmental issue.
 
 II. Merits of the Declaration
 A. Introduction
 
 70
 The district court declared that the Tribes have a right under the treaty "to a sufficient quantity of fish to provide a moderate living subject to a maximum of 50 percent of the harvestable anadromous fish," and a related right "not to have the fishery habitat degraded by the actions of man which cause environmental damage resulting in such a reduction of available harvestable fish that the moderate living standard ... cannot be met." The court further declared that the state has a correlative duty "to refrain from degrading or authorizing others to degrade the fish habitat to the extent that would deprive the Tribes of their moderate living needs." The court also assigned burdens of proof should further litigation be necessary. I would affirm the court's declarations on these issues.
 
 
 71
 B. The Tribes' right and the State's correlative duty
 
 
 72
 Fishing Vessel held that the treaty fishing clause gives the Tribes more than just equal access to the fishing grounds or "merely the chance ... occasionally to dip their nets into the territorial waters." 443 U.S. at 679, 99 S.Ct. at 3071. Rather, the treaty entitles the Tribes to an allocation of fifty percent of the harvestable fish runs that pass through their accustomed fishing places, subject to reduction if the Tribes' moderate living needs can be satisfied with less.
 
 
 73
 While I do not believe that the State can be required to alleviate shortages resulting from wholly natural causes, the language and reasoning of Fishing Vessel compel a finding that the State cannot, in the language of the district court's declaratory judgment, "degrade[ ] or authoriz[e] others to degrade the fish habitat to [an] extent that would deprive the Tribes of their moderate living needs."
 
 
 74
 The Court in Fishing Vessel expressed a concern that the State, in adjusting downward the fifty percent share, should not allow the Tribes' allocation to fall below the level necessary to meet moderate living needs. The treaty clause, explained the Court,
 
 
 75
 secures so much as, but no more than, is necessary to provide the Indians with a livelihood--that is to say, a moderate living. Accordingly, while the maximum possible allocation to the Indians is fixed at 50%, the minimum is not; the latter will, upon proper submission to the District Court, be modified in response to changing circumstances. If, for example, a tribe should dwindle to just a few members, or if it should find other sources of support that lead it to abandon its fisheries, a 45% or 50% allocation of an entire run that passes through its customary fishing grounds would be manifestly inappropriate because the livelihood of the tribe under those circumstances could not reasonably require an allotment of a large number of fish.
 
 
 76
 443 U.S. at 686-87, 99 S.Ct. at 3074-75 (emphasis added).[1] Additionally, the Court found its fish allocation scheme consistent with its prior decisions concerning Indian treaty rights to scarce natural resources. There, too, "the Court typically ordered a trial judge or special master, in his discretion, to devise some apportionment that assured that the Indians' reasonable livelihood needs would be met." Id. at 685, 99 S.Ct. at 3074 (emphasis added). Certainly this language would not be compatible with any scheme which permitted the State to reduce the Tribes' share below the level necessary to meet their moderate living needs.
 
 
 77
 The Court's reasons for concluding in Fishing Vessel that the Tribes are entitled to an actual share of the fish are also instructive here. As the Court noted when interpreting the treaty clause,
 
 
 78
 Governor Stevens and his associates were well aware of the "sense" in which the Indians were likely to view assurances regarding their fishing rights. During the negotiations, the vital importance of the fish to the Indians was repeatedly emphasized by both sides, and the Governor's promises that the treaties would protect that source of food and commerce were crucial in obtaining the Indians' assent. See supra, [443 U.S.] at 666-668 [99 S.Ct. at 3064-65]. It is absolutely clear, as Governor Stevens himself said, that neither he nor the Indians intended that the latter "should be excluded from their ancient fisheries," see n. 9, supra, and it is accordingly inconceivable that either party deliberately agreed to authorize future settlers to crowd the Indians out of any meaningful use of their accustomed places to fish. That each individual Indian would share an "equal opportunity" with thousands of newly arrived individual settlers is totally foreign to the spirit of the negotiations. Such a "right," along with the $207,500 paid the Indians, would hardly have been sufficient to compensate them for millions of acres they ceded to the Territory.
 
 
 79
 Id. at 676-77, 99 S.Ct. at 3069-70. If it is "inconceivable" that the Indians would have agreed to be required to fish on the same terms as non-Indians, it is equally unthinkable that they would have agreed to allow the State, or persons authorized by the State, to degrade the fish habitat in a way that would deprive them of their moderate living needs.[2] In this respect, the district court correctly noted that the Supreme Court's resolution of the Phase I allocation question "all but resolved" the environmental issue in the Tribes' favor. United States v. Washington, 506 F.Supp. 187, 203 (W.D.Wash.1980).
 
 
 80
 The district court's declaration that the State is under a correlative duty "to refrain from degrading or authorizing others to degrade the fish habitat to the extent that would deprive the Tribes of their moderate living needs" by no means represents an extraordinary limitation of State authority. Relations between the Indians and the federal government have always been the exclusive domain of the federal government--the states are excluded, unless Congress elects to include them. Those cases which allow the State a limited amount of regulatory control over Indian fishing are unusual exceptions to the general rule of non-interference. It was only the peculiarities of a shared fishery which necessitated the ruling in Puyallup Tribe v. Department of Game, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) ("Puyallup I "), that the State could exercise a slight degree of regulatory power. That control, moreover was permitted only to preserve the fish from extinction. Antoine v. Washington, 420 U.S. 194, 207, 95 S.Ct. 944, 951, 43 L.Ed.2d 129 (1975); Department of Game v. Puyallup Tribe, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) ("Puyallup II "). Thus, the result of those cases was to sanction for the first time a limited intrusion by the State into the exercise of federal treaty rights for purposes of fish conservation and proper division of the run. We should not extend this intrusion any further than is absolutely necessary.
 
 
 81
 In summary, I agree with the district court that the Tribes have an implicit treaty right to a sufficient quantity of fish to provide them with a moderate living, and the related right not to have the fishery habitat degraded to the extent that the minimum standard cannot be met. I also agree that the State has a correlative duty to refrain from degrading or authorizing others to degrade the fish habitat in such a manner.[3]
 
 C. Burden of proof
 
 82
 The district court's declaratory judgment set forth the parties' respective burdens of proof in the event further litigation is necessary on the environmental issue. I agree with the court's allocation.[4]
 
 
 83
 The plaintiffs should have the initial burden of proving that allegedly adverse environmental actions by the State proximately cause the fish habitat to be degraded such that the rearing or production potential of the fish will be impaired or the quality or quantity of the run will be diminished. Once this burden is met, the State should bear the burden of proving that the Tribes' moderate living needs are met despite such impairment.
 
 
 84
 We should leave it to district courts to define in the first instance, as facts are brought forward in any future litigation, the kinds of actions which may be attributed to the State, the precise causal connections required, the parameters of the phrase " moderate living needs," and the propriety of various forums of injunctive or monetary relief. Such issues were not raised in this declaratory judgment action, and to attempt to deal with them at this stage would serve to confuse, rather than to clarify, the treaty relationship here. That such issues were not raised here, however, does not render the court's declaration on the merits anything less than "precise resolution," maj. op. at 1357, of the scope of the treaty rights and duties. The district court's allocation of burden of proof, coupled with its environmental declaration, would go far in allowing for "immediate correction and remedial action by the courts," maj. op. at 1357, in the event the State violates its treaty duties. Sadly, the majority apparently does not agree.
 
 CONCLUSION
 
 85
 The majority properly affirms the district court's judgment that hatchery fish are "fish" under the treaty clause. I would hold, however, that the trial court properly employed the mechanism of declaratory relief on the environmental issue, and would affirm its declaration on that issue.
 
 
 86
 NORRIS, Circuit Judge, concurring in part and dissenting in part:
 
 
 87
 I concur in the judgment of the court on the hatchery fish issue. I dissent from the decision to vacate the declaratory judgment on the environmental issue for the reasons articulated in Judge Nelson's dissenting opinion. Because the court does not reach the merits of the environmental issue, I express no opinion on that issue at this time.
 
 
 88
 POOLE, Circuit Judge, dissenting.
 
 
 89
 Today, by per curiam opinion, this court has ventured in review of an appeal of two orders of the district court. Neither order is final under 28 U.S.C. Sec. 1291, nor brought by certification as a controlling issue of law under 28 U.S.C. Sec. 1292(b), nor accompanied by the trial judge's double certification called for by Rule 54(b) of the Federal Rules of Civil Procedure. Because I believe we are thus without jurisdiction to entertain such an appeal, I respectfully dissent.
 
 
 90
 A brief examination of two paragraphs of the majority opinion immediately discloses the basis of the majority's procedural confusion:
 
 
 91
 In July 1978, the Tribes filed with the district court a "Statement of Declaratory and Injunctive Relief." In November 1978, the [Tribes] filed a summary judgment motion seeking a declaratory judgment that the treaty reserves to the Tribes a right to protection against the State's "adverse environmental actions or inactions." In January 1980, the [Tribes] moved for partial summary judgment on the hatchery fish issue, seeking a declaration that "hatchery fish are included within the 'treaty right of taking fish.' "
 
 
 92
 The district court granted the motions and directed the parties to file a proposed order consistent with the factual findings and legal conclusion stated in its opinion. 506 F.Supp. at 208. The Tribes filed a proposed declaratory judgment, citing to 28 U.S.C. Sec. 2201, on both the environmental and hatchery fish issues. The proposed order by its terms excluded from its scope any "issue of whether the state has violated the treaty tribes' right to have the * * * environment protected" and "what remedies, if any, plaintiffs are entitled to." The proposed order stated that it "constitutes a final Declaratory Judgment and is reviewable as such."
 
 
 93
 Maj.Op. at 1356. Thus, the majority identifies the presence before the trial court for adjudication of a number of issues, of which it identifies four: the environmental and hatchery fish issues, whether the state was in violation of the treaty as to either, and whether injunctive or other relief was appropriate. Only two of the several issues as to which relief was being sought have been presented on this appeal. The case is not final or ripe for our review, and the majority has simply given an advisory opinion.
 
 
 94
 The district judge knew that his work was not done when he issued the two declaratory orders which the court has acted upon. He explicitly postponed for future consideration any implementation of his declaration, obviously preferring rather to have this court put its seal of approval upon his abstract scanning of the treaty's meaning. Put on hold was the formidable task of stating in concrete and meaningful terms to the state and to the Tribes the reality of that document's application to fishing rights in times of scarcity. Reserving for future hearings the making of the hard decisions was of course an option open to the trial court. All it had to do was to follow the procedures provided by law for disposing of "fewer than all of the claims" at issue. We do not know what the trial court really had in mind in adopting the ambiguous language, cited by the plaintiffs-authors, stating that the proposed order "constitutes a final Declaratory Judgment and is reviewable as such." We do know that there are still many issues left in the case.
 
 
 95
 Rule 54(b) of the Federal Rules of Civil Procedure provides:
 
 
 96
 When more than one claim for relief is presented in an action, * * * the court may direct the entry of a final judgment as to one or more but fewer than all of the claims * * * only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.
 
 
 97
 (Emphasis supplied.) The language of the rule is mandatory and applies to "any order or other form of decision, however designated, which adjudicates fewer than all the claims * * *." The rule does not purport to make an exception simply because the judgment is designated as a final declaratory judgment. The absence of a certification under Rule 54(b) renders non-final and hence non-appealable both orders in this case because these orders did not adjudicate all the claims nor the rights and liabilities of all the parties.
 
 
 98
 It would be anomalous were Rule 54(b) subject to avoidance merely by labeling any non-final order a "declaration," and hence allow for review in advance of the end of the case. This would nullify the rule and would enlarge the declaratory judgment exception so as to permit endless advisory judgments by the courts of appeals. Therefore, since neither order qualifies for review as a final or certified order, the majority is wrong in granting review for there is no jurisdiction to do so. We may have time in future days to regret opening the door to such appeals.
 
 
 99
 Nor is either order in the present posture reviewable under the discretionary appeal provision of 28 U.S.C. Sec. 1292(b), for that section merely permits a trial court to certify for review a ruling deemed to constitute a "controlling question of law" where an immediate appeal may help speed the end of litigation. An appeal under Sec. 1292(b) also requires a certification by the trial court, and the appeal is discretionary by this court. The trial judge could have made a Sec. 1292(b) certification, but did not, and the majority does not contend that that statutory authorization is implicated.
 
 
 100
 Basing its rationale on a novel application of "judicial discretion" which it seems somehow to believe supplies appellate jurisdiction to review any order felicitously styled as a declaratory judgment, the majority assumes an unexplained authority to decide the merits of both the environmental and hatchery fish issues without once mentioning Rule 54(b) or Sec. 1292(b). The majority has contrived a remarkably simplistic disposition of the environmental issue, perceiving no difficulty in coming to grips with its merits, and simply dismissing that ruling of the trial court with the statement that "issuance of the declaratory judgment on [that] issue is contrary to the exercise of sound judicial discretion," Maj. Op. at 1357, because that judgment is "imprecise in definition and uncertain in dimension." Id. at 1357. I cannot fathom the reasoning supporting this determination. The environmental claim is said to be before us, not as a discretionary appeal, but as a judgment of finality here for review. We might well include that the judgment is not supported by the record, justifying reversal, or that it suffered some technical shortcoming which barred review, justifying remand or dismissal. But I know of no principle which otherwise empowers us to omit decision on a judgment which is final enough for us to review its content, but so mystically infirm that, in our "discretion," we simply vacate it--for lack of enough finality!
 
 
 101
 In its wisdom, the majority has declined either to endorse or disapprove the district court's declaration as to the most important issue before it: whether degradation by act or permission of the state contravenes the treaty. Saying that "precise resolution, not general admonition, is the function of declaratory relief," id., misses the entire point and purpose of appellate review of interim trial court rulings. If partial judgment is in order, and there is "no just reason for delay," concreteness and "precise resolution" will be obvious under Rule 54(b). If, though not ripe for finality, the ruling is on a "controlling question of law" 28 U.S.C. Sec. 1292(b) does not require much more than ascertaining that there was a ruling on a controlling legal question. And, 28 U.S.C. Sec. 2201 requires little more when ascertaining that there was a ruling on a controlling legal question. And, 28 U.S.C. Sec. 2201 requires little more when that statute is properly at issue.
 
 
 102
 In this case, Judge Orrick's environmental ruling, while not purporting to end the case, was clear enough to be understood by all sides as a ruling. It stated:
 
 
 103
 The treaties reserve to the tribes a sufficient quantity of fish to satisfy their moderate living needs, subject to a ceiling of 50 percent of the harvestable run. [Citation omitted.] That is the minimal need which gives rise to an implied right to environmental protection of the fish habitat. Therefore, the correlative duty imposed upon the State (as well as the United States and third parties) is to refrain from degrading the fish habitat to an extent that would deprive the tribes of their moderate living needs.
 
 
 104
 506 F.Supp. at 208.
 
 
 105
 The proper course for the majority, if it thought it had a final 28 U.S.C. Sec. 2201 declaratory judgment on this appeal, would have been to rule on its merits. Instead, the majority accepts final order jurisdiction and then vacates the order as not having said enough. Thus the Sec. 2201 order is treated as if it were a Sec. 1292(b) discretionary appeal and is ordered vacated. Mirabile dictu ! This straddles everything and leaves nothing clear.
 
 
 106
 I believe we err in deciding either issue. Certainly, if the majority is correct in deeming the environmental judgment not appropriate for appellate review, that must be because the trial court merely made a mid-trial ruling which would guide the trial but could be changed, and at any rate would need implementation in the future. Trial judges do that all the time. That is what 28 U.S.C. Sec. 1292(b) purports to make reviewable on proper certification. This is what Rule 54(b) recognizes as decisions "subject to revision at any time" before final judgment. Perhaps, anticipating how much more ground was yet to be covered before the environmental problems would be concluded, the majority was reluctant to make the district court's interlocutory ruling become law of the case. At any event, upon this court's mandate, the hatchery fish issue will become such case law--despite the fact that the hatchery decision has meaning only in relation to the vacated environmental ruling.
 
 
 107
 Of course this case has gone through many stages and the majority's desire to reach some conclusion is understandable. But it should be the right conclusion and should not set a dangerous review precedent for the future. The proper treatment of these unfinished declarations would be to return both to the trial court, without prejudice to the trial court's right to invoke Rule 54(b) or Sec. 1292(b), if appropriate, so that both issues may be finally determined together. Neither is now in shape for us to decide. I would dismiss the appeal for want of jurisdiction because of the absence of any final order under 28 U.S.C. Sec. 1291, or certification under Fed.R.Civ.P. 54(b), or certification under 28 U.S.C. Sec. 1292(b), and would direct the district court to do it right.
 
 
 
 [1]
 We recently relied on this language from Fishing Vessel to find that the Klamath Indians are entitled to that level of water use which will supply them with a "moderate living" standard. See United States v. Adair, 723 F.2d 1394 (9th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984)
 
 
 [2]
 The State urges us to approve any government plan to degrade the habitat as long as it is applied to treaty and non-treaty fishermen alike. However, the Supreme Court has already rejected the contention that the treaties confer upon the Indians only those rights enjoyed by non-Indians. As the Court stated in Fishing Vessel, "[w]hatever opportunities the treaty assures Indians with respect to fish are admittedly not 'equal' to, but are to some extent greater than, those afforded other citizens...." 443 U.S. at 676-77 n. 22, 99 S.Ct. at 3069-70 n. 22. The notion that non-discriminatory equal treatment of Indians and non-Indians fulfills the State's obligation ignores the very bargain the Indians struck by signing the Treaties. They did not bargain for equal treatment; they bargained for the right to take fish
 
 
 [3]
 The portion of the district court's declaratory judgment on these related environmental issues reads as follows:
 
 
 [2]
 The fishing clauses of the Stevens Treaties implicitly reserve to the Tribes the right to a sufficient quantity of fish to provide a moderate living subject to a maximum of 50 percent of the harvestable anadromous fish
 
 
 [3]
 The Tribes have an implicitly incorporated right under the fishing clauses of the Stevens treaties not to have the fishery habitat degraded by the actions of man which cause environmental damage resulting in such a reduction of available harvestable fish that the moderate living standard, as implemented through the allocation orders of the District Court in Phase I, cannot be met
 
 
 [4]
 The State has a correlative duty under the Supremacy Clause of the Constitution of the United States, independent of the duty of the United States and of third parties, to refrain from degrading or authorizing others to degrade the fish habitat to the extent that would deprive the Tribes of their moderate living needs, as implemented through the allocation orders of the District Court in Phase I
 
 
 [4]
 The portion of the district court's judgment allocating burdens of proof reads as follows:
 
 
 [5]
 The plaintiffs bear the burden of proving that those actions which are challenged proximately cause the fish habitat to be degraded such that the rearing or production potential of the fish will be impaired or the size or quality of the run will be diminished
 
 
 [6]
 The State has the burden of showing that the environmental damage to the fishery resource proved by the plaintiffs will not impair the Tribes' moderate living needs, as implemented through the allocation orders of the District Court in Phase I. If the treaty allocation of harvestable fish is at 50 percent, then there is a presumption that the moderate living needs are not being met